THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHAUNTEL L. ANDREWS, Defendant-Appellant.

Second District   No. 2—03—0959

Opinion filed March 24, 2006.

Thomas A. Lilien and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

John A. Barsanti, State's Attorney, of St. Charles (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Kristine A. Karlin, of Mt. Prospect, for the People.

JUSTICE KAPALA delivered the opinion of the court:

Defendant, Shauntel L. Andrews, was charged by indictment with aggravated vehicular hijacking while carrying a firearm (720 ILCS 5/18—4(a)(4) (West 2002)). A first trial ended in a mistrial due to jury deadlock. On retrial, a second jury convicted defendant of the offense, and the trial court sentenced him to 14 years' imprisonment. Defendant timely appealed, contending first that his second trial violated his rights under the double jeopardy clauses of the United States and Illinois Constitutions. Second, defendant contended that the offense of aggravated vehicular hijacking while carrying a firearm (720 ILCS 5/18—4(a)(4) (West 2002)) was declared unconstitutional in *People v. Moss*, 206 Ill. 2d 503 (2003), and, therefore, his conviction must be reversed and supplanted with a conviction of the lesser-included offense of vehicular hijacking (720 ILCS 5/18—3 (West 2002)). As alternatives to his second contention, defendant contended that the evidence presented at his second trial was insufficient to sustain his conviction, and that the trial court erred in refusing to answer a question posed by the jury during its deliberation at the second trial.

In *People v. Andrews*, 358 Ill. App. 3d 744 (2005), we rejected defendant's first appellate contention but agreed with defendant's second contention and, consequently, we reversed defendant's conviction of aggravated vehicular hijacking while carrying a firearm in

violation of subsection 18—4(a)(4) and vacated his 14-year sentence. We found it unnecessary to reach defendant's alternate contentions. We also ordered the entry of a judgment of conviction of the Class 1 felony offense of vehicular hijacking (720 ILCS 5/18—3 (West 2002)), and we remanded the cause to the trial court for resentencing. The State filed a petition for leave to appeal. Our supreme court denied the petition but, under its supervisory authority, directed this court to vacate our judgment and to reconsider in light of *People v. Sharpe*, 216 Ill. 2d 481 (2005), which was handed down while the State's petition was pending. The parties have filed supplemental briefs addressing the impact of *Sharpe* on defendant's appeal. We now vacate our prior opinion and file this opinion in its stead. Upon reconsideration, we continue to reject defendant's first appellate contention, and we agree with defendant's new proportionate penalties clause challenge. Consequently, we reverse defendant's conviction of aggravated vehicular hijacking while carrying a firearm in violation of subsection 18—4(a)(4), and vacate his 14-year sentence. We continue to find it unnecessary to reach defendant's alternate contentions. We order the entry of a judgment of conviction of the Class 1 felony offense of vehicular hijacking (720 ILCS 5/18—3 (West 2002)), and we remand the cause to the circuit court of Kane County for resentencing.

## I. FACTS

### A. The First Jury Trial

Defendant's first jury trial began on February 3, 2003. Erica Rocha testified that she drove her mother's white pickup truck to an Office Depot in Aurora, Illinois, on September 28, 2002. Erica's friend Amber Ibarra was Erica's passenger. After Erica parked the pickup truck, a man with a goatee, wearing a black "hoody" and black "Wilson" gloves, approached the pickup truck. Erica made an in-court identification of defendant as the man who approached the pickup truck. Defendant told Erica that he liked her truck and that he wanted to show her something, and he then pulled out a gun. Erica described the gun as a black metal revolver with rust spots and scratches on it. Defendant told Erica and Amber to empty their pockets and to give him all their money. After Erica and Amber told defendant that they had no money, defendant said that he liked the truck and was going to take it. After Erica asked defendant not to take the truck, defendant asked if it was worth her life. With that, Erica said no, and she and Amber got out of the pickup truck. Defendant got into the pickup truck and drove away. Thereafter, Erica telephoned the police. On October 4, 2002, Detective Guillermo Trujillo of the Aurora police department showed Erica two six-photograph arrays. Erica identified

the person depicted in photograph number four in the second array as the person who took her mother's pickup truck. The individual depicted in photograph number four was defendant. On cross-examination, Erica agreed that the gun defendant had on the afternoon in question could have been fake, but she believed that it was real.

Amber Ibarra's testimony was substantially similar to Erica's testimony. Amber also made an in-court identification of defendant as the man who hijacked the pickup truck. Amber independently selected a photograph of defendant from the same arrays of photographs viewed by Erica. On cross-examination, Amber added that she saw defendant get out of a car before he approached the pickup truck. Amber responded affirmatively to defense counsel's question, "[a]nd that car you said had a half-circle shape on the trunk?"

Detective Trujillo testified that he met with Erica Rocha and Amber Ibarra on October 4, 2002, and interviewed them individually. Both Erica and Amber selected a photograph of defendant from the second of two photograph arrays and indicated that the photograph was of the man who hijacked the white pickup truck. When asked on cross-examination why he included a photograph of defendant in the photograph arrays, Detective Trujillo said that defendant's name was given to him by the North Chicago police department based on information provided to them from the arrest of James Walls and Angelo Wilcox in North Chicago. Detective Trujillo said that the North Chicago police department obtained defendant's name from James Walls and Angelo Wilcox. Detective Trujillo did not elaborate further on why defendant's photograph was included.

In his case, defendant called Officer Steven Bonnie, who testified that he took a description of the suspect from Erica Rocha and Amber Ibarra on September 28, 2002. Officer Bonnie said that in his report he used the hairstyle code "CUR," from the Aurora police department's code sheet, which corresponded to the hairstyle category of "curly slash [A]fro." On cross-examination, Officer Bonnie said that Erica and Amber told him that the suspect was an approximately 6-foot-tall, 180-pound African-American with short black hair and brown eyes, and facial hair on his chin.

Evidence technician Renaldo Rivera of the Aurora police department testified that he processed a 1997 Dodge pickup truck and a 1973 Ford Thunderbird in connection with this case. Officer Rivera indicated that he believed that the Thunderbird had a crescent or half-moon shape on the trunk. Officer Rivera said that he took prints from the Dodge pickup truck, but the prints were not sent to the lab. No gun was found in either vehicle. Officer Rivera found four black

batting gloves in the Thunderbird, but none were "Wilson" batting gloves.

Defendant testified in the narrative. He admitted that he was convicted of two felony offenses in 1998. Defendant testified that he had never seen Erica Rocha or Amber Ibarra before their appearance at his trial and had never seen the pickup truck. Defendant admitted that the 1973 Ford Thunderbird belonged to him, but he claimed that the vehicle was towed from the house of a girl named Lakesha on September 28, 2002, and that he was nowhere near his car on that date. Defendant denied telling Sergeant Bell of the North Chicago police department that he sold his car to Demetrius Wilcox of Waukegan.

In its rebuttal case, for impeachment purposes, the State produced certified copies of defendant's 1998 conviction of attempted armed robbery in Kane County and defendant's 1998 conviction of attempted armed robbery in Kendall County.

In addition to giving the jury instructions on the charged offense of aggravated vehicular hijacking while carrying a firearm (720 ILCS 5/18—4(a)(4) (West 2002)), on defendant's motion and over the objection of the State, the trial court gave the jury instructions on the lesser-included offense of vehicular hijacking (720 ILCS 5/18—3(a) (West 2002)). Additionally, on the State's motion and over defendant's objection, the trial court gave the jury instructions on the lesser-included offense of aggravated vehicular hijacking with a dangerous weapon (720 ILCS 5/18—4(a)(3) (West 2002)).

The jury began deliberating at 10 a.m. After an undetermined period of time, the jury posed two questions, and the following exchange between the trial court and the attorneys ensued:

"THE COURT: Well, counsel we have some questions.

Question No. 1, what is the testimony or was there any testimony on where the pickup was found?

Second question, can we see the transcript?

I think—personally I think the answer to the first question is clear, that we can't answer it.

The second part, can we see the transcript, I believe is discretionary with the Court. There is something in the record. Although, I don't recall anything in the record on where the pickup was found.

[ASSISTANT STATE'S ATTORNEY]: Correct. There would be no transcript that would be helpful.

THE COURT: So, do you wish for the Court to answer the question that way? There is no transcript that would be helpful to answer these questions?

[DEFENSE COUNSEL]: May I have a moment, Your Honor?

(Pause.)

[ASSISTANT STATE'S ATTORNEY]: Judge, our suggestion would be a simple answer. You've heard the testimony and the evidence. Please continue to deliberate.

[DEFENSE COUNSEL]: We concur with that.

THE COURT: All right. I will answer it that way.

(Pause.)

THE COURT: I will answer you have heard the testimony of the witnesses and seen the evidence. Please continue to deliberate to your verdict.

Stay close, folks."

After the jurors deliberated further, they sent a message to the trial court at approximately 2 p.m. The following discussion ensued:

"THE COURT: We have a message from the jury. The message reads: We are deadlocked at seven/five. We all believe that the likelihood of reaching a unanimous verdict is slim.

Do you want to give them the Prim instruction?

[ASSISTANT STATE'S ATTORNEY]: No.

THE COURT: Do you want me to declare a mistrial?

[ASSISTANT STATE'S ATTORNEY]: Yes.

THE COURT: Okay.

[DEFENSE COUNSEL]: Judge, they've only been out for less than four hours.

(Pause.)

[DEFENSE COUNSEL]: Judge, after speaking with the defendant, since the jury hasn't been out quite four hours, we'd ask that the Prim instruction be given."

Thereafter, the trial court instructed the jury, in accordance with *People v. Prim*, 53 Ill. 2d 62, 75-76 (1972), to continue deliberating to a verdict:

"THE COURT: Ladies and gentlemen of the jury, I have another instruction for you.

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto.

Your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment.

Each of you must decide the case for yourself. But do so only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose or returning a verdict.

You are not partisans, you are judges, judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

With that, I'd ask you to return to the jury room and continue deliberating to a verdict."

After the jury returned to the jury room, the following comments were made:

"THE COURT: We need to determine a time.

[ASSISTANT STATE'S ATTORNEY]: Wait to see if they say anything else.

THE COURT: There's going to be a time where I need—I can't be here with them for a short period of time because I have an appointment previously made. So if they're still out during that period of time, that will keep them out an hour and a half while I'm gone or we designate a time no later than 3:30 and find out if they've made any progress.

Otherwise, I don't mind keeping them here till midnight if you want to do that, I have no problems with that. But there's going to be a period of time where I cannot entertain them and they have to stay deliberating.

[ASSISTANT STATE'S ATTORNEY]: Why don't we meet back here at whatever time accommodates your schedule and then makes [sic] a decision?

THE COURT: 3:20 come back, we'll discuss it. In the meantime, check your schedules for Monday. We'll do it all over again on Monday if need be."

At approximately 3:20 p.m., the parties convened. The report of proceedings discloses the following:

"THE COURT: Mr. Andrews is here. I believe what we should do is bring 'em out and see if they're any closer to arriving at a verdict. If they say no, then I'll entertain your motion again.

Anybody know where [defense counsel] is?

THE CLERK: He's on his way.

THE COURT: Do you want to line them up, Cathy? As soon as [defense counsel] gets in, we'll bring 'em in.

Did you wish to make your motion in front of the jury?

[ASSISTANT STATE'S ATTORNEY]: No.

THE COURT: Bring 'em in.

[DEFENSE COUNSEL]: Judge, could we address the Court before the jury?

THE COURT: I don't think we're going to have time now, they're coming in.

\*\*\*

THE COURT: Ladies and gentlemen of the jury, are you any closer to arriving at a verdict?

THE FOREPERSON: We are not, Judge.

THE COURT: You are not. Very well.

Would you ask the ladies and gentlemen of the jury to take a recess just briefly?

THE COURT: I think we had them deliberate approximately an hour and a half since the last count.

[ASSISTANT STATE'S ATTORNEY]: Correct.

THE COURT: Any motions?

[ASSISTANT STATE'S ATTORNEY]: Your honor, at this point they appear deadlocked. I believe their deliberation has gone on longer than the actual trial testimony. I make a motion for a mistrial.

[DEFENSE COUNSEL]: Judge, may I be heard?

THE COURT: Yes. You don't have to stand.

[DEFENSE COUNSEL]: Judge, this is a Class X charge with a statutory—this is a Class X charge with a statutory add-on that may or may not be constitutional of 15 years. That would add up to a maximum of 45 years which would amount to a life sentence for this defendant in prison.

The jury has been out five and a half hours. One hour and a half or one hour and 20 minutes since the Prim instruction was given.

The jury has offered no new messages, they're still at work as they were asked to be on the Prim instruction.

We are asking that this jury continue to deliberate. We could bring this jury back tomorrow to continue to deliberate if scheduling is a problem.

The defendant's objecting to a mistrial in any form.

And Judge, we were going to object to the jury being called out because we didn't want them to feel like they were being pressured into a verdict. But they were called out anyway. And we're objecting to a mistrial in this case.

THE COURT: The court has entertained arguments.

The court finds that the evidence was not unduly complicated. The court would find the evidence, in fact, was quite simple.

The Court would find the charges were not unduly complicated. And the Court has allowed three different variations for the jury's determination of this particular charge.

The jury has been deliberating from 10:00 this morning and it's now 3:30. The court finds that the questions tendered to the Court indicate some confusion, that the last message indicates to the Court that they are deadlocked at seven-five and they believe that the likelihood of reaching a unanimous verdict is slim. The Court has instructed the jury according to People v. Prim, Illinois Pattern Jury Instruction 26.07.

The last question asked of the foreman, the court would note the foreman of this jury is a lawyer, indicates that this jury is hopelessly deadlocked.

This Court would find that further deliberations would not result in a verdict. The Court has considered the foreperson who is a lawyer's answer and intonation of his answer. The Court would find that manifest necessity requires a mistrial be declared and the jury be discharged.

If you will bring in the jury, I will do that."

Two days after the mistrial was declared, the assistant public defender representing defendant was permitted to withdraw from the case based on an undisclosed conflict of interest. New counsel was appointed to represent defendant.

## B. The Second Jury Trial

Defendant's second trial began on April 7, 2003. The testimony of Erica Rocha and Amber Ibarra was substantially the same at the second trial as their testimony at the first trial. However, Amber's testimony at the second trial included a more detailed description of the vehicle she noticed in the parking lot just before the hijacking. Amber said that defendant emerged from the passenger side of a two-door, long, "tannish, maroonish, brown," rusty car, with a half-moon in the back where the tire goes. When shown pictures of defendant's 1973 Thunderbird, Amber said that it was not the car from which defendant emerged.

The State called Officer Bonnie in its case in chief. Officer Bonnie said that Erica Rocha and Amber Ibarra described the individual who hijacked the pickup truck as an African-American male. After talking between themselves, Erica and Amber agreed that the man was about 6 feet tall and approximately 180 pounds. With respect to the suspect's hair, Officer Bonnie asked Erica and Amber if his hair was an Afro style haircut and they said yes. Officer Bonnie asked them if the suspect's hair was short, medium, or long, and they said short. Neither girl told him that the suspect's hair was curly. Officer Bonnie wrote the hairstyle code "CUR," from the Aurora police department's code sheet, which corresponded to the hairstyle category of "curly slash [A]fro," because that was the code that most closely described the girls' description of the suspect's hairstyle. The girls indicated to Officer Bonnie that the suspect had medium-toned skin and light facial hair on his chin. After the girls discussed the matter, Erica told Officer Bonnie that the suspect may have arrived in a red, rusty, two-door car.

The State also called Detective John Giamberduca of the North Chicago police department, who testified that on September 28, 2002, he responded to a report of subjects stealing the rims from a vehicle on a street in North Chicago. Detective Giamberduca located a white Dodge pickup truck that was missing two of its rims. Detective Giamberduca was advised that the subjects who stole the rims went to the

nearby residence of Lakesha Morgan. At the residence, Detective Giamberduca spoke to Lakesha Morgan and Angelo Wilcox and obtained information regarding the white pickup truck. The rims missing from the white pickup truck were found within the residence of Lakesha Morgan. After checking the license plate on the white pickup truck, Detective Giamberduca learned that it had been hijacked in Aurora, and he contacted Detective Trujillo. The white pickup truck was towed and secured along with a 1973 Ford Thunderbird parked at the residence of Lakesha Morgan. Detective Giamberduca believed that the Thunderbird was used in connection with stealing the pickup truck's rims, because he found gloves and tools used to remove lug nuts in that vehicle. On cross-examination, Detective Giamberduca indicated that he arrested Angelo Wilcox and James Walls and charged them with theft of the rims of and criminal trespass to the white pickup truck. Detective Giamberduca interviewed Wilcox, Walls, and Morgan and forwarded the information gleaned from these interviews to Detective Trujillo in Aurora.

Evidence technician Renaldo Rivera testified that he processed the white Dodge pickup truck and the Thunderbird, at Detective Trujillo's request. Officer Rivera lifted 14 fingerprint impressions from the exterior of the pickup truck and did not find any items of evidentiary value in the interior of the vehicle. Officer Rivera indicated that he recovered from the Thunderbird an impact wrench, an extension cord, some sockets and socket wrenches, two lug wrenches, two star lug wrenches, three black and white Franklin batting gloves, and one Mizuno batting glove. On cross-examination, Officer Rivera indicated that he found fingerprints within the interior of the white pickup but none were suitable for comparison. At Detective Trujillo's direction, the Thunderbird was not examined for fingerprints.

Detective Trujillo testified that on September 28, 2002, Detective Giamberduca of the North Chicago police department informed him that they had recovered a white Dodge pickup truck in North Chicago that was hijacked in Aurora and had arrested two subjects for stealing its rims. Detective Giamberduca provided Detective Trujillo with the names of two individuals whom Giamberduca's investigation showed were possibly involved in the hijacking. As a result, Detective Trujillo put together a photograph array that included a photograph of defendant, and he asked Detective Giamberduca to put together another photograph array that included a photograph of Demetrius Wilcox. Detective Trujillo explained that this is how there came to be two photograph arrays that were shown to Erica Rocha and Amber Ibarra. Detective Trujillo's testimony regarding Erica's and Amber's October 4, 2002, identifications of defendant from the second

photograph array was substantially the same as his testimony at defendant's first trial.

The State produced certified copies of the Illinois Secretary of State's records of registration of and title to the 1973 Ford Thunderbird. These records indicated that the vehicle was owned by and registered to defendant on September 28, 2002. Thereafter, the State rested. Defendant presented no evidence. In addition to giving the jury instructions on the charged offense of aggravated vehicular hijacking while carrying a firearm (720 ILCS 5/18—4(a)(4) (West 2002)), the trial court gave the jury instructions on the lesser-included offense of vehicular hijacking (720 ILCS 5/18—3(a) (West 2002)). The jury returned a verdict finding defendant guilty of aggravated vehicular hijacking while carrying a firearm.

Defendant filed a posttrial motion for judgment notwithstanding the verdict or for a new trial, alleging various trial errors. Defendant also filed a motion to declare the aggravated vehicular hijacking statute unconstitutional on the ground that it violates the ban on disproportionate penalties in the United States and Illinois Constitutions. Citing *People v. Moss*, 206 Ill. 2d 503 (2003), defense counsel argued that the sentencing portion of the statute (720 ILCS 5/18—4(b) (West 2002)) providing the 15/20/25-to-life sentencing enhancement renders the aggravated vehicular hijacking statute unconstitutional. Thereafter, defendant supplanted the motion to declare the statute unconstitutional with a motion to dismiss the aggravated vehicular hijacking with a firearm charge pursuant to section 114—1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/114—1 (West 2002)), claiming that in *Moss* the aggravated vehicular hijacking statute was declared unconstitutional. Defendant concluded that his conviction based on an unconstitutional statute was void and should be dismissed.

The trial court struck as unconstitutional the sentence-enhancing language of Public Act 91—404 (Pub. Act 91—404, § 5, eff. January 1, 2000), but held that the statute remained in force as it existed before Public Act 91—404 became effective. The trial court concluded that it would "revert back to the laws [sic] as it was prior to Public Act 91—404 which makes this offense a Class X felony [for] which the sentencing range is from six to 30." The trial court also denied defendant's posttrial motion for judgment notwithstanding the verdict or for a new trial. Thereafter the trial court sentenced defendant to 14 years' imprisonment.

## II. ANALYSIS

### A. Double Jeopardy

Defendant's first appellate contention is that because there was no

manifest necessity, the trial court abused its discretion in declaring a mistrial. Consequently, defendant argues that his second trial violated his constitutional right not to be placed in jeopardy twice for the same offense. The State argues that, considering the factors listed in *People v. Street*, 316 Ill. App. 3d 205, 211-12 (2000), the trial court's declaration of a mistrial was warranted by manifest necessity.

■ The fifth amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. The double jeopardy clause of the fifth amendment applies to the states through the due process clause of the fourteenth amendment. *Benton v. Maryland*, 395 U.S. 784, 787, 23 L. Ed. 2d 707, 711, 89 S. Ct. 2056, 2058 (1969). The Illinois Constitution also contains a double jeopardy clause providing that "[n]o person shall *** be twice put in jeopardy for the same offense." Ill. Const. 1970, art. I, § 10. Although defendant cites both clauses, he does not maintain that he is afforded more protection under the Illinois Constitution than he is under the United States Constitution. Moreover, it has been held that article I, section 10, of the Illinois Constitution is construed in the same manner as the double jeopardy clause of the fifth amendment to the United States Constitution (*Moss*, 206 Ill. 2d at 535) and provides no greater protection. *People v. Aleman*, 281 Ill. App. 3d 991, 1004 (1996), citing *People v. Levin*, 157 Ill. 2d 138, 160 (1993). Accordingly, our analysis of this issue is the same under both provisions.

•2 Where a mistrial is declared over a defendant's objection, retrial is permitted where there was a manifest necessity for declaring the mistrial. *Arizona v. Washington*, 434 U.S. 497, 505, 54 L. Ed. 2d 717, 728, 98 S. Ct. 824, 830 (1978); *People ex rel. Roberts v. Orenic*, 88 Ill. 2d 502, 508 (1981). The doctrine of manifest necessity allows a court to declare a mistrial if a "scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *United States v. Jorn*, 400 U.S. 470, 485, 27 L. Ed. 2d 543, 557, 91 S. Ct. 547, 557 (1971). When a jury is truly unable to reach a unanimous verdict, the defendant's jeopardy is not terminated. *Richardson v. United States*, 468 U.S. 317, 326, 82 L. Ed. 2d 242, 251, 104 S. Ct. 3081, 3086 (1984). Therefore, "a retrial following a 'hung jury' does not violate the Double Jeopardy Clause." *Richardson*, 468 U.S. at 324, 82 L. Ed. 2d at 250, 104 S. Ct. at 3085; *Washington*, 434 U.S. at 509, 54 L. Ed. 2d at 730, 98 S. Ct. at 832. In fact, a mistrial without the defendant's consent due to the jury's inability to reach a verdict has been called the "classic example" of an occasion where a second trial is permitted. *Downum v. United States*, 372 U.S. 734, 735-36, 10 L. Ed. 2d 100, 102,

83 S. Ct. 1033, 1034 (1963). A trial court's determination that there was manifest necessity for declaring a mistrial is reviewed under the abuse of discretion standard. *Washington*, 434 U.S. at 506 n.18, 54 L. Ed. 2d at 728 n.18, 98 S. Ct. at 830 n.18. The United States Supreme Court has explained the rationale for the great deference that must be afforded to the trial court's decision:

> "If retrial of the defendant were barred whenever an appellate court views the 'necessity' for a mistrial differently from the trial judge, there would be a danger that the latter, cognizant of the serious societal consequences of an erroneous ruling, would employ coercive means to break the apparent deadlock. Such a rule would frustrate the public interest in just judgments. The trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court." *Washington*, 434 U.S. at 509-10, 54 L. Ed. 2d at 730-31, 98 S. Ct. at 832.

■ Each manifest necessity ruling is grounded in its own facts such that the manifest necessity standard "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial." *Illinois v. Somerville*, 410 U.S. 458, 462, 35 L. Ed. 2d 425, 429, 93 S. Ct. 1066, 1069 (1973). The State suggests that we should apply the 12 factors listed in *Street* in conducting our analysis of whether the declaration of a mistrial in this case was an abuse of discretion. The 12 *Street* factors are a noncomprehensive list of a substantial number of factors that are regularly used in general manifest necessity analysis.[1] As such, we believe that a narrower group of factors is more useful in a case like this one where the specific issue presented is the manifest necessity for declaring a mistrial based on jury deadlock. Federal appellate courts have isolated six factors to be analyzed to determine if there was a manifest necessity for declaring a mistrial in a case of jury deadlock: (1) the jury's collective opinion that it cannot agree, (2) the length of deliberations, (3) the length of the trial, (4) the complexity of the issues presented to the jury, (5) any

---

[1]At issue in *Street* was the propriety of the declaration of a mistrial based upon the improper admission of evidence concerning prior sexual activity of the victim of an alleged sexual assault. As authority for its 12 factors, the court in *Street* (*Street*, 316 Ill. App. 3d at 211-12) cites to 5 W. LaFave, J. Israel & N. King, Criminal Procedure § 25.2(c), at 654-55 (2d ed. 1999), where, in footnote 18, 12 comprehensive factors are listed that enter into the assessment of manifest necessity on a fairly regular basis, gleaned from two law review articles (S. Schulhoefer, *Jeopardy and Mistrials*, 125 U. Pa. L. Rev. 449, 536 (1977) and P. Westen & R. Drubel, *Toward a General Theory of Double Jeopardy*, 1978 Sup. Ct. Rev. 81, 96).

proper communications that the judge has had with the jury, and (6) the effects of possible exhaustion and the impact that coercion of further deliberations might have had on the verdict. *United States v. Byrski*, 854 F.2d 955, 961 (7th Cir. 1988); *Rogers v. United States*, 609 F.2d 1315, 1317 (9th Cir. 1979).

Defendant offers several arguments in support of his contention that the trial court abused its discretion in declaring a mistrial due to jury deadlock. We will begin by addressing defendant's arguments that relate to the aforementioned six factors.

### 1. *The jury's collective opinion that it cannot agree*

■ Defendant argues that the jurors' 2 p.m. note, indicating that they were deadlocked at 7 to 5 and that they all believed that the likelihood of reaching a unanimous verdict was slim, did not indicate that the jury was hopelessly deadlocked or indicate that the chance for a unanimous verdict was nonexistent. Defendant maintains that the trial court's most egregious error was its 3:30 p.m. question: "Ladies and Gentlemen of the jury, are you any closer to arriving at a verdict?" Defendant maintains that this inquiry was improper because it was misdirected. The jurors' response to whether they would be any closer to arriving at a unanimous verdict does not answer the question of whether they were unable to ever reach a unanimous verdict given more time to deliberate. Defendant points out further that the trial court never asked the foreperson, or any other juror, whether he or she believed that a unanimous verdict could be reached if they were given more time to deliberate.

The foregoing points and arguments can be distilled into the single argument that the jury never made a statement that it would be unable to reach a unanimous verdict if given more time to deliberate. We reject that argument. We agree with defendant that it would have been preferable had the trial judge specifically asked the jurors what their views were about their ability to reach a verdict if they were given more time to deliberate. However, this record supports the conclusion that the jury was of the collective opinion that it was deadlocked and that further deliberations would not lead to a unanimous verdict. Having stated that they were deadlocked at 7 to 5 at 2 p.m. and, after having deliberated under the *Prim* instruction for 90 minutes, reporting that they were no closer to a verdict at 3:30 p.m. is a strong indication that further deliberations would not have resulted in a verdict. The foreperson's report that they were no closer to a verdict at 3:30 p.m. indicated that the vote remained 7 to 5. Further deliberations would have had to result in either 7 or 5 jurors changing their minds before a unanimous verdict could have been

reached. As such, we believe that it was within the realm of the trial court's discretion to conclude that the collective opinion of the jury was that it could not agree.

Defendant also claims that, as a result of the trial court's failure to poll the jury, the jury's statement that it was deadlocked came only from the foreperson and was not necessarily the view of all jurors. We conclude that this shortcoming does not render the trial court's decision to declare a mistrial based on the manifest necessity of jury deadlock an abuse of discretion.

Defendant directs us to no authority holding that reliance upon the jury's foreperson on the issue of deadlock without polling the other jurors is necessarily fatal. Our independent research reveals that the weight of authority is that mistrials due to jury deadlock may be properly declared even where the trial judge relies on the foreperson's statement without polling the other jurors. See *Escobar v. O'Leary*, 943 F.2d 711, 718 n.4 (7th Cir. 1991) (rejecting contention that mistrial based upon jury deadlock cannot be declared without polling jurors individually and holding that while polling jurors is preferable practice, trial judge is not obligated to conduct such a poll); *Byrski*, 854 F.2d at 962 (trial court's failure to poll the jurors is not necessarily fatal); *United States v. Klein*, 582 F.2d 186, 193 (2d Cir. 1978) (trial court acted within its sound discretion in declaring a mistrial even though the trial judge questioned only the jury foreman about deadlock and did not poll the entire jury); *United States v. Rodriguez*, 497 F.2d 172, 174 (5th Cir. 1974) (affirming district court's declaration of mistrial due to jury deadlock where only jury's foreman questioned); *United States v. Medansky*, 486 F.2d 807, 812 (7th Cir. 1973), *cert. denied*, 415 U.S. 989, 39 L. Ed. 2d 886, 94 S. Ct. 1587 (1974) (allowing retrial where the court questioned the foreperson but did not poll the jury on the issue of deadlock); *State v. Henderson*, 435 A.2d 1106, 1108 (Me. 1981) (trial court did not commit error in determining that jury was genuinely deadlocked even where each juror was not questioned individually); *State v. Pruit*, 216 Kan. 103, 107, 531 P.2d 860, 863 (1975) (no error in declaring mistrial due to jury deadlock where trial court was advised by jury's foreman that it was unable to reach a unanimous decision).

While we agree that polling each juror with respect to his or her opinion on the issue of deadlock would have been preferable, the record in this case amply demonstrates that it was within the trial court's discretion to conclude that the collective opinion of the jurors was that they were hopelessly deadlocked at 7 to 5. It is significant that the jury on its own initiative declared that it was deadlocked. The initial decision to notify the court at 2 p.m. that it was deadlocked at 7 to 5

was presumably reached by consensus. See *United States ex rel. Webb v. Court of Common Pleas*, 516 F.2d 1034, 1044 n.56 (3d Cir. 1975) (the appellate court criticized the trial judge for directing inquiry only to the foreperson and not the entire jury, but noted that "[i]f the jury had on its own initiative, declared itself deadlocked, there might have been less necessity for the judge to have inquired into the opinions of the other jurors since, in such a situation, the jury would presumably have reached a consensus before reporting its deadlock to the judge"). At 3:30 p.m., the foreperson, as spokesperson for the jury, indicated in the presence of the rest of the jury that it was no closer to reaching a verdict, that is, the vote remained 7 to 5. Under these circumstances, we do not believe that the trial judge's failure to poll the jury rendered his decision to declare a mistrial an abuse of discretion.

## 2. *The length of deliberations, length of trial, and complexity of the issues*

■ In general, the longer the trial and the more complex the evidence, the longer the jury should be given to deliberate before a finding of hopeless deadlock can be declared. Defendant recognizes that the trial court has discretion as to the length of deliberations, but he points out that 5½ hours of deliberations during regular business hours in a case involving a Class X felony was not unusually or inappropriately lengthy. " 'In determining how long a jury should be permitted to deliberate before a mistrial is declared and the jury is discharged, no fixed time can be prescribed, and great latitude must be accorded to the trial court in the exercise of its informed discretion.' " *People v. Largent*, 337 Ill. App. 3d 835, 843 (2003), quoting *People v. Wolf*, 178 Ill. App. 3d 1064, 1066 (1989). Considering the short case presented by the State and the relatively simple issues that faced the jury, the length of the jury's deliberation was not so brief that we can conclude that the trial court abused its discretion.

At trial, the State and defendant presented just three witnesses each, the testimony of all six witnesses was given in one afternoon, there was only one offense charged, and the only contested issues for the jury to decide were whether defendant was the individual who hijacked the pickup truck and whether a firearm was used. Defendant argues that the trial court's conclusion that the charge and evidence were not unduly complicated and, therefore, did not require lengthy deliberations ignored the fact that the jury submitted questions focused on the omission of evidence as to where the pickup truck was found. It is defendant's position that the circumstances leading up to the inclusion of defendant's photograph in the array that was shown to Erica and Amber was related to the jurors' assessment of the

identification of defendant. We agree that evidence indicating how defendant came to be suspected in the hijacking, and in turn came to be included in one of the photo arrays shown to the witnesses, would have affected the accuracy of Erica's and Amber's identification testimony. However, the fact that the jury indicated a desire to know more does not make the case that was presented to it complex. Thus, we believe that it was within the parameters of the trial court's discretion to conclude that the evidence presented was not complex and that the jury deliberated for a sufficient period of time in light of the length of the trial and the issues presented. The trial court was clearly in the best position to evaluate these factors.

### 3. *Communications between the judge and the jury*

■ Defendant argues that the trial court's failure to provide the requested information to the jury likely complicated the decision making process for at least one of the jurors. Defendant also asserts that if the jury's problem was that some jurors mistakenly believed that evidence was presented as to where the pickup truck was found, an answer to the question might have ended the dispute and resulted in a verdict. Putting aside the speculative nature of defendant's assertion, the general rule is that the trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion. *People v. Millsap*, 189 Ill. 2d 155, 160 (2000). However, a trial court may exercise its discretion and properly decline to answer a jury's inquiry if it involves a question of fact or if the giving of an answer would cause the court to express an opinion that would likely direct a verdict one way or another. *Millsap*, 189 Ill. 2d at 161. The jury's question, "[W]hat is the testimony or was there any testimony on where the pickup was found?" was factual and, therefore, whether or not to answer the question was in the trial court's discretion. The trial court's decision to answer the jury's question with the response, "you have heard the testimony of the witnesses and seen the evidence. Please continue to deliberate to your verdict," was not outside the range of the trial court's discretion.

### 4. *Other arguments*

Defendant makes no arguments that bear upon the sixth factor used to determine whether the trial court abused its discretion in declaring a mistrial due to jury deadlock: the effects of possible exhaustion and the impact that coercion of further deliberations might have had on the verdict. However, defendant makes three additional arguments.

■ First, defendant argues that the trial judge's decision to declare

a mistrial may have been influenced by his need to leave the courthouse soon after 3:30 p.m. in order to keep an appointment. Defendant asserts that the trial court's *sua sponte* decision to stop the jury's deliberations 90 minutes after it was given the *Prim* instruction, as opposed to waiting for the jury to complete its deliberations or indicate that it was unable to reach a verdict, reveals the possibility that the trial judge's personal appointment was his actual motivation for bringing jury deliberations to an end, not his considered judgment that the jury was truly hopelessly deadlocked. We disagree. The trial judge's motivation for interrupting the jury's deliberations at 3:30 p.m. was to check on its progress in order to prevent the jury from sitting idle while he attended his appointment. The trial judge's concern was that during the 90-minute period that he would be absent, the jury would be unable to return a verdict or communicate to the court that it was still deadlocked. There is nothing in the record to indicate that the trial judge would not have allowed further deliberations had the jury reported progress toward a verdict. In fact, the trial judge stated that he did not mind keeping the jury there till midnight if need be.

■ Second, defendant argues that the trial judge's comments in recognition of the fact that the jury's foreperson was a lawyer give rise to a concern that the judge deferred to the foreperson's judgment as to whether the jury was hopelessly deadlocked, rather than exercising his own considered judgment. We disagree. The record shows that the trial court considered the fact that the jury's foreperson was a lawyer in assessing the foreperson's opinion that the jury was deadlocked but, in light of the trial court's consideration of other relevant factors, there is nothing in the record to indicate that the trial court relied on the foreman's judgment in making the ultimate determination that the jury was indeed deadlocked.

■ Third, defendant claims that the State's motivation for accepting the trial court's invitation to move for a mistrial was its realization from the jury's questions that its case was too scant to result in a conviction. In support of this claim, defendant points to the prosecutor's negative response to the trial court's question, "do you want to give them the *Prim* instruction?" and affirmative response to the question, "do you want me to declare a mistrial?" and to the considerable improvement in the State's case at the second trial. We fail to see how the State's desire for a mistrial after the jury indicated that it was deadlocked is relevant to this analysis. The State's preference for a mistrial is not one of the six factors identified by federal courts to be analyzed to determine if there was a manifest necessity to declare a mistrial in a case of jury deadlock. We recognize that 1 of the 12 fac-

tors listed in *Street* is whether the evidence the State presented, prior to the mistrial, suggested a weakness in its case, such as a witness failing to testify as anticipated. *Street*, 316 Ill. App. 3d at 212. However, this factor is applicable where it is asserted that the State took some action to bring a mistrial about because its case was going badly. Here, the State took no such action.

In sum, in view of the great deference we must afford such decisions, defendant's arguments considered individually or collectively do not convince us that the trial court abused its discretion when it determined that a mistrial was a manifest necessity because the jury was hopelessly deadlocked and, implicitly, that the ends of public justice would not be served by a continuation of the proceedings. Thus, retrial did not violate defendant's double jeopardy rights under the United States and Illinois Constitutions.

### B. Proportionate Penalties Challenge

Statutes are presumed to be constitutional. *Sharpe*, 216 Ill. 2d at 487. In order to overcome this presumption, a party challenging a statute must clearly establish that the statute violates the constitution. *Sharpe*, 216 Ill. 2d at 487. We review *de novo* the constitutionality of a statute. *Sharpe*, 216 Ill. 2d at 486-87.

Article I, section 11, of the Illinois Constitution of 1970 provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A proportionate penalties challenge contends that the penalty in question was not determined according to the seriousness of the offense. *Sharpe*, 216 Ill. 2d at 487. Prior to our supreme court's decision in *Sharpe*, there were three distinct ways to assert a proportionate penalties challenge: (1) the "cruel or degrading" test (*Sharpe*, 216 Ill. 2d at 521), (2) the "cross-comparison" test (*Sharpe*, 216 Ill. 2d at 488), and (3) the "identical elements" test (*Sharpe*, 216 Ill. 2d at 503-05, citing *People v. Lewis*, 175 Ill. 2d 412, 421-22 (1996), and *People v. Christy*, 139 Ill. 2d 172, 181 (1990)). *Moss* involved a proportionate penalties challenge to the "15/20/25-to-life" sentencing enhancements added to certain offenses by Public Act 91—404. *Moss*, 206 Ill. 2d at 506. Applying the cross-comparison test, our supreme court held that, "with regard to the statutes for armed robbery (720 ILCS 5/18—2 (West 2000)), aggravated kidnapping (720 ILCS 5/10—2 (West 2000)), and aggravated vehicular hijacking (720 ILCS 5/18—4 (West 2000)), the 15- and 20-year add-ons mandated by Public Act 91—404 violate the proportionate penalties clause of the Illinois Constitution." *Moss*, 206 Ill. 2d at 531.

Originally, defendant's second appellate contention was that aggravated vehicular hijacking while carrying a firearm (720 ILCS 5/18—4(a)(4) (West 2002)) was declared unconstitutional in *Moss* and, therefore, his conviction of that offense could not stand. Defendant requested that his conviction be reduced to a conviction of the lesser-included offense of vehicular hijacking (720 ILCS 5/18—3 (West 2002)). In our previous opinion, we agreed with defendant and granted his request. *Andrews*, 358 Ill. App. 3d at 746. Subsequently, on October 6, 2005, our supreme court handed down its decision in *Sharpe*, abolishing the cross-comparison test and overruling *Moss*. The court concluded that comparing the penalties for offenses with different elements never should have been a part of proportionate penalties jurisprudence. *Sharpe*, 216 Ill. 2d at 516-17. The court specifically stated that "[t]hose cases that used such an analysis to invalidate a penalty are overruled." *Sharpe*, 216 Ill. 2d at 519. The court held that "[a] defendant may no longer challenge a penalty under the proportionate penalties clause by comparing it with the penalty for an offense with different elements. We retain the other two types of proportionate penalties challenges." *Sharpe*, 216 Ill. 2d at 521. In his supplemental brief, subsequent to our supreme court's supervisory order, defendant abandons his proportionate penalties contention based on *Moss* and mounts a new proportionate penalties challenge based on the identical elements test. The parties agree that defendant has not waived or forfeited this new constitutional challenge by failing to raise it earlier.

A proportionate penalties challenge based on the identical elements test asserts that a penalty for one offense is harsher than the penalty for a different offense that contains identical elements. *Sharpe*, 216 Ill. 2d at 521. Defendant argues that the penalty for aggravated vehicular hijacking while carrying a firearm (720 ILCS 5/18—4(a)(4) (West 2002)) is harsher than the penalty for an offense with identical elements, armed violence with a Category 1 weapon predicated upon the offense of vehicular hijacking (720 ILCS 5/33A—2(a) (West 2002)). All Category I weapons are firearms (720 ILCS 5/33A—1(c)(2) (West 2002)) and the parties do not dispute that the firearm at issue in this case was a Category I weapon. The State argues that the identical elements test is inapplicable in this case.

The offense of aggravated vehicular hijacking while carrying a firearm is defined through the following provisions:

> "(a) A person commits aggravated vehicular hijacking when he or she violates Section 18—3; and
> * * *
> (4) he or she carries on or about his or her person or is

otherwise armed with a firearm[.]" 720 ILCS 5/18—4 (West 2002).

"A person commits vehicular hijacking when he or she takes a motor vehicle from the person or the immediate presence of another by use of force or by threatening the imminent use of force." 720 ILCS 5/18—3(a) (West 2002).

" 'Firearm' means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas[.]" 430 ILCS 65/1.1 (West 2002); 720 ILCS 5/2—7.5 (West 2002).

Consequently, the elements of aggravated vehicular hijacking while carrying a firearm are (1) taking a motor vehicle from the person or the immediate presence of another; (2) by use of force or by threatening the imminent use of force; and (3) carrying or being otherwise armed with a firearm. Aggravated vehicular hijacking while carrying a firearm "is a Class X felony for which 15 years shall be added to the term of imprisonment imposed by the court." 720 ILCS 5/18—4(b) (West 2002). The sentence for a Class X felony shall be not less than 6 years and not more than 30 years. 730 ILCS 5/5—8—1(a)(3) (West 2002). Thus, the applicable penalty upon conviction of aggravated vehicular hijacking while carrying a firearm is a range of 21 to 45 years' imprisonment.

In comparison, armed violence with a Category I weapon predicated upon the offense of vehicular hijacking is defined through the following provisions:

"A person commits armed violence when, while armed with a dangerous weapon, he commits any felony defined by Illinois Law, except first degree murder, attempted first degree murder, intentional homicide of an unborn child, predatory criminal sexual assault of a child, aggravated criminal sexual assault, aggravated kidnaping, aggravated battery of a child, home invasion, armed robbery, or aggravated vehicular hijacking." 720 ILCS 5/33A—2(a) (West 2002).

"A person commits vehicular hijacking when he or she takes a motor vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18—3(a) (West 2002).

"Vehicular hijacking is a Class 1 felony." 720 ILCS 5/18—3(c) (West 2002).

"A person is considered armed with a dangerous weapon for purposes of [armed violence], when he or she carries on or about his or her person or is otherwise armed with a Category I, Category II, or Category III weapon." 720 ILCS 5/33A—1(c)(1) (West 2002).

"A Category I weapon is a handgun, sawed-off shot-gun, sawed-

off rifle, any other firearm small enough to be concealed upon the person, semiautomatic firearm, or machine gun." 720 ILCS 5/33A—1(c)(2) (West 2002).

Consequently, the elements of the offense of armed violence with a Category I weapon predicated upon the offense of vehicular hijacking are (1) taking a motor vehicle from the person or the immediate presence of another; (2) by use of force or by threatening the imminent use of force; and (3) carrying or being otherwise armed with a Category I weapon. The penalty for armed violence with a Category I weapon predicated upon the offense of vehicular hijacking is a Class X felony for which the defendant shall be sentenced to a minimum term of imprisonment of 15 years. 720 ILCS 5/33A—3(a) (West 2002). Thus, the applicable penalty upon conviction of the offense of armed violence with a Category I weapon predicated upon the offense of vehicular hijacking is 15 to 30 years' imprisonment.

■ Based on the foregoing analysis, we conclude that commission of vehicular hijacking while carrying a firearm constitutes both aggravated vehicular hijacking while carrying a firearm and armed violence with a Category I weapon predicated on the offense of vehicular hijacking. The proportionate penalties clause is violated where, as here, substantively identical offenses are punished with disparate penalties. See *Lewis*, 175 Ill. 2d at 418. Where the elements of two offenses are identical, "common sense and sound logic would seemingly dictate that their penalties be identical." *Christy*, 139 Ill. 2d at 181. Accordingly, based on the identical elements test, we hold that the penalty for aggravated vehicular hijacking while carrying a firearm is constitutionally disproportionate to the penalty for armed violence with a Category I weapon predicated upon the offense of vehicular hijacking.

The State argues that because aggravated vehicular hijacking is excluded from the "any felony" language of subsection 33A—2(a), there is no basis to undertake the identical elements test or to hold the enhanced penalty for aggravated vehicular hijacking unconstitutional. The State explains that because aggravated vehicular hijacking cannot be a predicate felony offense for the offense of armed violence, it logically follows that the lesser-included offense of vehicular hijacking also cannot serve as a predicate felony offense for armed violence. In short, the State is arguing that there is no such offense as armed violence predicated upon vehicular hijacking.

The State cites no authority or rule of statutory construction in support of its argument that we should find that the express exclusion of the offense of aggravated vehicular hijacking in subsection 33A—2(a) logically dictates the exclusion of the unlisted offense of vehicular

hijacking. Accordingly, this argument is waived. See 188 Ill. 2d R. 341(e)(7). Waiver aside, the State's argument lacks merit. The primary rule of statutory construction is to ascertain and give effect to the legislature's intent. *People v. Whitney*, 188 Ill. 2d 91, 97 (1999). A statute's language provides the best means of determining legislative intent, and that language should be given its plain and ordinary meaning. *Whitney*, 188 Ill. 2d at 97. Where the statutory language is clear and unambiguous, its plain meaning will be given effect. *Whitney*, 188 Ill. 2d at 97. Subsection 33A—2(a) excludes exactly 10 felony offenses from the "commits any felony defined by Illinois Law" element of the offense of armed violence, and vehicular hijacking is not among them.

The State posits that by excluding the 10 felony offenses in subsection 33A—2(a), the General Assembly intended to preclude proportionate penalties challenges to the penalties for the offenses to which the 15/20/25-to-life sentencing enhancement apply where the penalties for those offenses are compared to the penalties for armed violence. This may well have been the General Assembly's intent in view of the fact that, in addition to providing the 15/20/25-to-life sentencing provisions, Public Act 91—404 rewrote subsection 33A—2(a) to exclude the 10 felony offenses from the "commits any felony defined by Illinois Law" element of the offense of armed violence. With the exception of first degree murder, these were the offenses to which Public Act 91— 404 applied the 15/20/25-to-life sentencing enhancement. Nevertheless, despite any purported intent, by leaving vehicular hijacking off the list of excluded felony offenses in subsection 33A—2(a), the General Assembly failed to preclude an identical elements proportionate penalties challenge comparing the offense of aggravated vehicular hijacking while carrying a firearm with the offense of armed violence with a Category I weapon predicated on vehicular hijacking.

Citing *People v. Cummings*, 351 Ill. App. 3d 343, 347 (2004), the State appears to argue further that because defendant was not charged with armed violence with a Category I weapon, he cannot utilize the identical elements test to compare the elements of and penalty for that offense with those of the offense with which he was charged and of which he was convicted. We disagree. A proportionate penalties challenge based on the identical elements test is not limited to comparing offenses with which a defendant is charged. See *Christy*, 139 Ill. 2d at 177-81 (using identical elements test, compared the charged offense of armed violence with a Category I weapon predicated on kidnapping with the uncharged offense of aggravated kidnapping); *People v. Hampton*, 363 Ill. App. 3d 293, 308 (2005) (constitutional prohibition against disproportionate penalties for identical crimes cannot be relaxed where the State decides to proceed only with the crime carrying the greater

penalty). In *Christy*, the court found that the complained-of penalty was disproportionate based on an identical elements test involving only offenses with which the defendant was charged, but *Christy* is not authority for the proposition that the identical elements test is so limited. To the extent *Cummings* holds otherwise, we disagree.

### C. Severability of the 15-year Sentencing Enhancement

•■ Having concluded that defendant's identical elements proportionate penalties challenge has merit, we must again determine if the trial court properly severed the 15-year add-on provision from the substantive offense of aggravated vehicular hijacking while carrying a firearm in violation of subsection 18—4(a). On this issue, our analysis follows the reasoning in our now-vacated prior opinion.

The State maintains that the trial court properly determined that the invalid 15-year add-on sentencing provision was severable from the remainder of the aggravated vehicular hijacking statute and that, therefore, defendant is not entitled to a reduction of his conviction from aggravated vehicular hijacking to vehicular hijacking.

Prior to the enactment of Public Act 91—404 (Pub. Act 91—404, § 5, eff. January 1, 2000), section 18—4 provided:

"§ 18—4. Aggravated vehicular hijacking.

(a) A person commits aggravated vehicular hijacking when he or she violates Section 18—3 [vehicular hijacking]; and

(1) the person from whose immediate presence the motor vehicle is taken is a physically handicapped person or a person 60 years of age or over; or

(2) a person under 16 years of age is a passenger in the motor vehicle at the time of the offense; or

(3) he or she carries on or about his or her person, or is otherwise armed with a dangerous weapon.

(b) Sentence. Aggravated vehicular hijacking in violation of subsections (a)(1) or (a)(2) is a Class X felony. Aggravated vehicular hijacking in violation of subsection (a)(3) is a Class X felony for which a term of imprisonment of not less than 7 years shall be imposed." 720 ILCS 5/18—4 (West 1998).

Public Act 91—404 increased the penalties for committing certain felony offenses, including aggravated vehicular hijacking, "to deter the use of firearms in the commission of a felony offense." Pub. Act 91—404, § 5, eff. January 1, 2000 (codified at 720 ILCS 5/33A—1 (West 2002)). These additional penalties have been referred to as the "15/20/25-to-life" provisions. See *Moss*, 206 Ill. 2d at 514. After the enactment of Public Act 91—404, section 18—4 provided:

"§ 18—4. Aggravated vehicular hijacking.

(a) A person commits aggravated vehicular hijacking when he or she violates Section 18—3 [vehicular hijacking]; and

(1) the person from whose immediate presence the motor vehicle is taken is a physically handicapped person or a person 60 years of age or over; or

(2) a person under 16 years of age is a passenger in the motor vehicle at the time of the offense; or

(3) he or she carries on or about his or her person, or is otherwise armed with a dangerous weapon, other than a firearm; or

(4) he or she carries on or about his or her person or is otherwise armed with a firearm; or

(5) he or she, during the commission of the offense, personally discharges a firearm; or

(6) he or she, during the commission of the offense, personally discharges a firearm that proximately causes great bodily harm, permanent disability, permanent disfigurement, or death to another person.

(b) Sentence. Aggravated vehicular hijacking in violation of subsections (a)(1) or (a)(2) is a Class X felony. Aggravated vehicular hijacking in violation of subsection (a)(3) is a Class X felony for which a term of imprisonment of not less than 7 years shall be imposed. Aggravated vehicular hijacking in violation of subsection (a)(4) is a Class X felony for which 15 years shall be added to the term of imprisonment imposed by the court. Aggravated vehicular hijacking in violation of subsection (a)(5) is a Class X felony for which 20 years shall be added to the term of imprisonment imposed by the court. Aggravated vehicular hijacking in violation of subsection (a)(6) is a Class X felony for which 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." 720 ILCS 5/18—4 (West 2002).

Defendant argues that, as a result of our determination that the 15-year sentencing enhancement is unconstitutionally disproportionate, aggravated vehicular hijacking while carrying a firearm in violation of subsection 18—4(a) is a criminal statute without a penalty and that such a provision is not a valid law. As such, defendant concludes that the trial court's finding that the add-on provision was severable from the elements provision set forth in subsection 18—4(a)(4) was improper because the constitutionally invalid penalty portion of the statute is essentially and inseparably connected to the elements provision.

Initially, the State asserts that defendant cannot raise this issue for the first time on appeal because he did not urge the trial court to sentence him for the Class 1 felony offense of vehicular hijacking. The State asserts that the trial court, faced with defendant's motion to dismiss, had only the options of granting the motion and dismissing

the charge altogether or denying the motion and sentencing defendant under the version of section 18—4 that existed before the Public Act 91—404 amendments. Defendant maintains that he did raise the issue in the trial court and, in any event, an attack on the constitutionality of a statute may be raised at any time. We believe that the issue of the validity of defendant's conviction of aggravated vehicular hijacking while in possession of a firearm in violation of subsection 18—4(a)(4) was squarely raised in the trial court. The fact that defendant argued only that the charge should be dismissed, without requesting that a conviction be entered on the lesser-included offense of vehicular hijacking, does not foreclose such a request on appeal.

Alternatively, the State takes the position that the trial court properly severed the invalid subsections 18—4(a)(4) and 18—4(b) from the remainder of section 18—4 and properly sentenced defendant under the statute as it existed before it was amended by Public Act 91—404. Therefore, the State concludes that defendant is not entitled to be resentenced under the Class 1 felony of vehicular hijacking.

The State is incorrect when it asserts that the trial court severed both subsections 18—4(a)(4) and 18—4(b) from the rest of section 18—4. In ruling on defendant's posttrial motion to dismiss, the trial court stated:

> "[I]nstead of ruling 720 ILCS 5/18—4 unconstitutional in total, this Court has the authority to service [sic] offending and unconstitutional language and the authority comes under 5 ILCS 70/[1.31] and severability is possible under the general severability statute and has been approved in the case of People versus Watts at 181 Ill. 2d 133.
>
> ***
>
> The sentencing enhancement language of Public Act 91—404 will be stricken as unconstitutional pursuant to People versus Moss. The Court has already eluded [sic] to that. This court does have the duty to construe statutes in favor of their constitutionality and validity and for that reason would strike only the provisions of the statute that enhanced the sentence for the use of a firearm."

Thereafter, the trial court cited various authorities for the proposition of law that the effect of an unconstitutional amendment to a statute is that the statute in force prior to the amendment controls. The trial court stated further that "[t]he Court will then revert back to the laws [sic] as it was prior to Public Act 91—404 which makes this a Class X felony [for] which the sentencing range is from six to 30."

Although the trial court purported to do so, it did not apply the aggravated vehicular hijacking statute as it existed before the statute was amended by Public Act 91—404. Rather, the trial court severed

the portion of the aggravated vehicular hijacking statute that it determined was held unconstitutional under *Moss*, namely, that portion of subsection 18—4(b) requiring the 15-year add-on for violations of subsection 18—4(a)(4). The trial court proceeded to enter a judgment of conviction of the offense of aggravated vehicular hijacking while carrying a firearm in violation of subsection 18—4(a)(4), and sentenced defendant to 14 years' imprisonment, a term within the Class X felony range of 6 to 30 years. Since subsection 18—4(a)(4) did not exist prior to the Public Act 91—404 amendments to section 18—4, defendant was not convicted of and sentenced pursuant to the statute as it formerly existed. We agree with defendant's contention that the severance of the 15-year add-on without the severance of the offense of aggravated vehicular hijacking while carrying a firearm in subsection 18—4(a)(4) was impermissible.

Public Act 91—404 did not contain a severability provision, so we look to the Statute on Statutes' general severability provision:

"§ 1.31. If any provision of an Act enacted after the effective date of this amendatory Act [(August 31, 1976)] or application thereof to any person or circumstance is held invalid, such invalidity does not effect other provisions or applications of the Act which can be given effect without the invalid application or provision, and to this end the provisions of each Act enacted after the effective date of this amendatory Act are severable, unless otherwise provided by the Act." 5 ILCS 70/1.31 (West 2002).

The test governing severability is in two parts. "First, we must determine 'whether the valid and invalid portions of the statute are essentially and inseparably connected in substance.' [Citation.] Second, we must determine whether the legislature would have enacted the valid portions without the invalid portions. [Citation.] This inquiry is a question of legislative intent." *People v. Alexander*, 204 Ill. 2d 472, 484 (2003).

The trial court effectively severed the words, *"for which 15 years shall be added to the term of imprisonment imposed by the court,"* from Public Act 91—404 and left the rest of the Act's amendments to section 18—4 intact, including the creation of the offense of aggravated vehicular hijacking while carrying a firearm under subsection 18—4(a)(4). In evaluating the propriety of this severance, the first inquiry is whether the elements portion within subsection 18—4(a)(4) of the offense of aggravated vehicular hijacking while carrying a firearm and the 15-year add-on sentencing provision are essentially and inseparably connected in substance. We believe that the provisions are so connected because the two provisions were intended to work together as a whole to accomplish the sole purpose of punishing those who commit

vehicular hijacking while carrying a firearm more severely than those who commit the offense while carrying other weapons.

The second inquiry, whether the legislature would have created the offense of aggravated vehicular hijacking while carrying a firearm (720 ILCS 5/18—4(a)(4) (West 2002)) without the 15-year add-on sentencing provision, is similarly answered. We conclude that the legislature would not have because the only purpose of creating this new category of aggravated vehicular hijacking was to punish persons who carry firearms while committing vehicular hijacking more severely than persons who carry other types of weapons while committing vehicular hijacking. The express legislative intent of Public Act 91—404 was as follows:

> "In order to deter the use of firearms in the commission of a felony offense, the General Assembly deems it appropriate for a greater penalty to be imposed when a firearm is used or discharged in the commission of an offense than the penalty imposed for using other types of weapons and for the penalty to increase on more serious offenses." Pub. Act 91—404, § 5, eff. January 1, 2000 (codified at 720 ILCS 5/33A—1(b)(1) (West 2002)).

In furtherance of its stated purpose, Public Act 91—404 removed the offense of aggravated vehicular hijacking while carrying a firearm from subsection 18—4(a)(3) by adding the words "other than a firearm" to subsection 18—4(a)(3). Public Act 91—404 then created three new categories of aggravated vehicular hijacking involving a firearm, based on the degree to which the firearm is involved in the commission of the offense. Specifically, Public Act 91—404 created subsection 18—4(a)(4) (720 ILCS 5/18—4(a)(4) (West 2002) (commits vehicular hijacking and "carries on or about his or her person or is otherwise armed with a firearm")), subsection 18—4(a)(5) (720 ILCS 5/18—4(a)(5) (West 2002) (commits vehicular hijacking and "during the commission of the offense, personally discharges a firearm")), and subsection 18—4(a)(6) (720 ILCS 5/18—4(a)(6) (West 2002) (commits vehicular hijacking and "during the commission of the offense, personally discharges a firearm that proximately causes great bodily harm, permanent disability, permanent disfigurement, or death to another person")). The sole purpose of creating these three new categories of aggravated vehicular hijacking, which had all formerly been species of the Class X felony offense of aggravated vehicular hijacking with a dangerous weapon under subsection 18—4(a)(3), was to create an increasingly severe penalty for using or discharging a firearm during the commission of vehicular hijacking. As such, we conclude that the General Assembly would not have created the new category of aggravated vehicular hijacking while carrying a firearm under subsec-

tion 18—4(a)(4) if it did not have the intent to punish violations of that subsection with the 15-year add-on sentencing provision.

With the unconstitutional amendments of Public Act 91—404 properly severed, the trial court was left with section 18—4 as it existed prior to the Public Act 91—404 amendments (720 ILCS 5/18—4 (West 1998)). See *People v. Gersch*, 135 Ill. 2d 384, 390 (1990) (effect of enacting an unconstitutional amendment to a statute is to leave the law in force as it was before the adoption of the amendment). The former statute did not include the offense described in subsection 18—4(a)(4), the subsection defendant was charged with violating. Our determination that the 15-year add-on is unconstitutional renders subsection 18—4(a)(4) void *ab initio*; that is, it is as if the law never existed. See *People v. Tellez-Valencia*, 188 Ill. 2d 523, 526 (1999). The indictment returned in this case thus failed to state an offense because subsection 18—4(a)(4) was not in effect when the offense with which defendant was charged was committed. Our supreme court has stated that "the defect caused by charging an offense based upon a statute not in effect when the alleged offense occurred is fatal, rendering the entire instrument invalid, and warranting reversal of defendant's convictions." *Tellez-Valencia*, 188 Ill. 2d at 527.

We note that there is no question that the conduct defendant was charged with committing constituted the offense described in subsection 18—4(a)(3) of the former aggravated vehicular hijacking statute, because a firearm was certainly a "dangerous weapon" under the former statute (720 ILCS 5/18—4(a)(3) (West 1998)). Nevertheless, the State made no motion in the trial court to amend the indictment to reflect a violation of that subsection. Moreover, in *Tellez-Valencia*, our supreme court held that it is not permissible to amend pursuant to section 111—5 of the Code of Criminal Procedure of 1963 (725 ILCS 5/111—5 (West 1998)) an indictment on appeal in order to charge an existing valid criminal offense in place of a charged offense that has been declared void. *Tellez-Valencia*, 188 Ill. 2d at 526-27. Accordingly, defendant's conviction of aggravated vehicular hijacking while carrying a firearm (720 ILCS 5/18—4(a)(4) (West 2002)) cannot stand. Consequently, we reverse defendant's conviction of that offense and vacate the 14-year sentence imposed on that conviction.

The remaining issue is defendant's request that we enter a judgment of conviction of the Class 1 felony offense of vehicular hijacking (720 ILCS 5/18—3 (West 2002)) in place of the reversed conviction and remand the cause to the trial court for resentencing. The jury was instructed on the lesser-included offense of vehicular hijacking and, based on its returning a guilty verdict on the aggravated vehicular hijacking charge, necessarily found that the State had proved beyond

a reasonable doubt all the elements of that offense. Accordingly, based on the foregoing, and considering our power pursuant to Supreme Court Rule 615(b) (134 Ill. 2d R. 615(b)) to reduce the degree of the original conviction to a lesser-included offense, we grant defendant's request.

## III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the circuit court of Kane County entering a conviction of aggravated vehicular hijacking in violation of subsection 18—4(a)(4) (720 ILCS 5/18—4(a)(4) (West 2002)) and vacate the 14-year sentence imposed thereon. We also order the entry of a judgment of conviction of vehicular hijacking in violation of section 18—3 (720 ILCS 5/18—3 (West 2002)) and remand this cause to the trial court for resentencing.

Reversed and remanded.

BOWMAN and HUTCHINSON, JJ., concur.