STATE of Minnesota, Respondent,

v.

**Leonard Arthur OLSON, Appellant.**

No. C3–99–1558.

Court of Appeals of Minnesota.

May 2, 2000.

Jerry Strauss, Strauss & Associates, Minneapolis, for appellant.

Mike Hatch, Attorney General, Catherine M. Keane, Assistant Attorney General, St. Paul, Jeffrey R. Edblad, Isanti County Attorney, Cambridge, for respondent.

Considered and decided by RANDALL, Presiding Judge, AMUNDSON, Judge, and HUSPENI,* Judge.

## OPINION

RANDALL, Judge

This is an appeal from an order denying postconviction relief. Appellant argues that double jeopardy barred his retrial after the district court declared a mistrial in his first case. In that trial, the district court denied appellant's substitute counsel's motion for a continuance. The denial of that motion had the effect of forcing appellant to proceed pro se at trial. After jeopardy attached, the district court reconsidered its earlier denial of a continuance and now decided that a mistrial should be declared as a method of giving appellant a continuance.

Appellant argues that the district court erred in finding that he, acting pro se, impliedly consented to the district court's declaration of a mistrial. Appellant argues he never waived his right to the defense of double jeopardy. Appellant also argues that his first attorney rendered ineffective assistance of counsel. That issue is moot because appellant's first attorney was discharged long before he went to trial. We conclude that double jeopardy protects appellant from having to go through a second trial. We reverse.

## FACTS

On December 12, 1996, appellant Leonard Arthur Olson was charged by complaint filed in Isanti County District Court with second-degree criminal sexual conduct and gross-misdemeanor criminal sexual conduct in the fifth-degree. The complaint alleged that on the evening of December 10, 1996, Olson molested six-year old N.P. by placing his arm around her and touching her genital area.

At his first appearance on December 18, 1996, Olson was represented by attorney Gerald Paulson. Following a number of pre-trial proceedings, the matter was set for trial on August 4, 1997. At the state's request, the trial was continued until September 2, 1997, and the matter was then set for trial on November 3, 1997. The matter was continued again and eventually set for trial on January 5, 1998.

By letter dated December 31, 1997, Paulson informed the district court that Olson had discharged him. On January 5, 1998, Olson appeared without counsel and stated that he recently fired Paulson. The district court appointed the district public defender, Arden Fritz, to represent Olson. After Fritz and Olson had the chance to

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. Art. VI, § 10.

speak, Fritz informed the court that Olson declined public defender representation. Fritz then stated that it was inappropriate for the public defender's office to represent Olson absent a finding that Olson was eligible for public defender services. The district court stated that Olson did not want to represent himself, but told him, "since [you] discharged private counsel and declined to be represented by the Public Defender's office as primary, that really leaves you with representing yourself." The court then appointed Fritz as standby counsel and continued the matter to the next day so Olson could procure his file from Paulson.

The next day, Olson appeared, accompanied by attorney Jerry Strauss. Strauss appeared to argue a motion for a continuance and agreed to represent Olson if the motion was granted. Strauss argued for a minimum 30–day continuance, given the complexity and seriousness of the case. He stated that he was confident Olson did not fire Paulson as a delay tactic. He further stated that in light of the fee Olson was able to secure for his representation, Olson was serious about defending his case.

The district court stated that it did not like to grant continuances where defendants fired their lawyers on the eve of trial. It noted that in the previous two months an apparent trend was developing where defendants would fire their attorneys on the eve of trial so they could obtain a continuance. The district court perceived this as a ploy "by people who don't want to go to trial." The court noted that it was concerned about calendaring issues and stated that "any disadvantage that [Olson] is suffering is his own doing." The court continued, stating that it "must adhere to management standards that don't grant continuances unless they're absolutely necessary. There is no showing of necessity." Strauss responded, stating that "to take [a] trial courtroom management schedule, before constitutional rights is * * * grievous err [sic]." On the rec-

ord, the district court denied Strauss's motion for a continuance. Strauss then declined to represent Olson because he was totally unprepared for an immediate trial.

Olson was then given the chance to be heard. He stated that Paulson advised him that the longer the case continued, the better it was for the defense. Not knowing better, Olson took Paulson at his word. The court concluded by commenting, "I think by delaying the right of the people of this State to a timely trial, I would be doing the wrong thing. So I'm not going to do it." Then the trial started. After a 15–minute recess, Olson attempted to conduct voir dire *with the assistance of the prosecutor*. The jury was then impaneled and sworn.

On the morning of January 9, the district court convened the jury with the intent of beginning the taking of evidence. Outside the presence of the jury, the court briefly recited the procedural history of the case and noted that Olson was "involuntarily representing himself" and that Olson never affirmatively stated that he wanted to represent himself. The court acknowledged it was forcing Olson to represent himself, stating, "the circumstances are that I've basically ordered [Olson] out to trial after he discharged his Lawyer that he had for a one year period." When asked by the court if he was competent to represent himself, Olson stated that he was not. Olson repeated his contention that he did not want the previous continuances and that he was simply following Paulson's advice. Olson questioned how he himself, or Fritz, or any other attorney, could adequately present a defense without being granted a continuance and time to prepare.

Fritz put on the record that he objected to the court's decision to appoint the public defender's officer to represent Olson or act as standby counsel. He noted that Olson never completed a public defender application form and that by statute, the public defender's office cannot represent a defendant unless the individual meets the indi-

gency standards set forth by statute. He also stated that he was "strictly incompetent" to represent Olson because he had no time to review the file and was completely unfamiliar with the facts of the case. He asked permission to withdraw as standby counsel.

The district court denied Fritz's motion and adjourned to reconsider its decision compelling Olson to proceed pro se and to reconsider the necessity of a continuance. Approximately an hour later, the district court granted a 30–day continuance. The court acknowledged, "This is not an election to represent oneself, this is an imposition of self-representation * * *." The court was concerned that any conviction obtained would be reversed and that "bad law would be made," limiting a district court's ability to manage its trial calendar.

The prosecutor stated that double jeopardy was now an issue because the jury had been impaneled and sworn. He quickly moved the district court for a mistrial. The court agreed and declared a mistrial. The court attributed the mistrial to Olson's "dilatory behavior" and not to the state's conduct. Neither Olson nor Fritz was given the opportunity to object to the prosecutor's request for a mistrial. The matter was set for a new trial on March 2, 1998.

Shortly before this trial, Olson moved the district court to dismiss the case, arguing that because jeopardy had attached at the previous trial, which was declared a mistrial by the court without his consent, the principle of double jeopardy barred a retrial. After a motion hearing, the district court denied Olson's motion, ruling Olson was "minimally prejudiced by a retrial." Olson filed an appeal with this court, seeking review of the district court's order denying his motion. The appeal was dismissed by this court because it was not taken from a final judgment.

On March 10, 1998, Olson stipulated to the state's case pursuant to *State v. Lothenbach*, 296 N.W.2d 854 (Minn.1980). The district court (a different judge) found Olson guilty. On June 18, 1998, Olson was

sentenced, and the judgment of conviction was entered. Olson received a stayed 21–month term of imprisonment and was placed on probation for up to 25 years.

On November 5, 1998, Olson filed a second appeal, arguing the issue of double jeopardy. On March 26, 1999, this court dismissed the appeal as untimely. On April 30, 1999, Olson filed a petition for postconviction relief, alleging that his right against double jeopardy had been violated and that he had received ineffective assistance of counsel. Following a hearing, the postconviction court denied Olson's petition on August 30, 1999. This appeal followed.

## ISSUES

1. Whether the claims raised in appellant's petition for postconviction relief are procedurally barred.

2. Whether double jeopardy attached and barred a retrial of appellant.

3. Whether appellant received ineffective assistance of counsel in his first trial.

## ANALYSIS

### I. Appealability

██ Review of a postconviction proceeding is limited to determining "whether there is sufficient evidence to support the postconviction court's findings, and a postconviction court's decision will not be disturbed absent an abuse of discretion." *Hodgson v. State*, 540 N.W.2d 515, 517 (Minn.1995) (citation omitted).

██ The state argues Olson's petition for postconviction relief is procedurally barred because the issue of double jeopardy was raised in Olson's direct appeal. We disagree.

██ Generally, where a direct appeal has been taken, the matters raised therein and all matters known, but not raised at that time, will not be considered in a subsequent petition for postconviction relief "unless the claim is so novel that it can be

said that its legal basis was not reasonably available to counsel at the time the direct appeal was taken and decided." *Roby v. State*, 531 N.W.2d 482, 484 (Minn.1995) (quotation omitted). In limited situations, however, if fairness so requires, and if the petitioner did not deliberately and inexcusably fail to raise the issue on direct appeal, a reviewing court will consider a claim contained in a petition for postconviction relief, even if the claim was known at the time of direct appeal or its legal basis may have been reasonably available. *Id.*

■ In *Rairdon v. State*, 557 N.W.2d 318 (Minn.1996), the petitioner filed a direct appeal, but then stipulated to its dismissal. *Id.* at 322. The court held that it would not extend the general rule that issues raised in or known at the time of direct appeal may not be considered in a later postconviction proceeding to a petitioner "who merely *files* a direct appeal, but whose claims do not receive actual appellate review." *Id.* The court noted its decision was based on its "commitment to convicted defendants' rights to substantive review." *Id.* (citation omitted).

To adopt the state's argument would deny Olson of his right to at least one substantive review of his conviction. Although Olson did file a direct appeal, the issues presented were never reviewed or addressed on the merits. The matter was dismissed on procedural and not substantive grounds. Because the issues presented in Olson's petition for postconviction relief were never actually reviewed in his direct appeal, he is not precluded from raising them in a petition for postconviction relief.

## II. Double Jeopardy

Olson argues that the double jeopardy clauses of the Minnesota and United States Constitutions barred a second trial because judicial misconduct forced the mistrial and the mistrial was granted without his consent.

■ An individual may not be put twice in jeopardy for the same offense. U.S. Const. amend. V; Minn. Const. art. I, § 7. Generally, jeopardy attaches once a jury is impaneled and sworn. *State v. McDonald*, 298 Minn. 449, 452, 215 N.W.2d 607, 609 (1974). "[T]he prohibition against double jeopardy is not to protect the individual against the peril of a second punishment, but to protect him against a second trial for the same offense." *Id.* (citations omitted). In cases where a mistrial has been declared, " 'the conclusion that jeopardy has attached begins, rather than ends, the inquiry as to whether [the] Double Jeopardy [Clause] bars retrial.' " *State v. Long*, 562 N.W.2d 292, 296 (Minn. 1997) (quoting *Illinois v. Somerville*, 410 U.S. 458, 467, 93 S.Ct. 1066, 1072, 35 L.Ed.2d 425 (1973)).[1]

■ The necessity of a mistrial is committed to the discretion of the district court. *McDonald*, 298 Minn. at 454, 215 N.W.2d at 610. The district court is in the best position to evaluate whether "for compelling reasons, 'the ends of substantial justice cannot be attained without discontinuing the trial.' " *Long*, 562 N.W.2d at 296 (quoting *Gori v. United States*, 367 U.S. 364, 368, 81 S.Ct. 1523, 1526, 6 L.Ed.2d 901 (1961)). The court's discretion should be exercised with caution and to serve the ends of public justice. *Id.*

■ If the defendant requests the mistrial, double jeopardy does not bar a second trial unless governmental misconduct provoked the mistrial request. *State v. Fuller*, 374 N.W.2d 722, 726 (Minn.1985).

---

1. The defendant in *Long* filed a federal habeas corpus claim, challenging the Minnesota Supreme Court's decision. *See Long v. Humphrey*, 184 F.3d 758 (8th Cir.1999). The Eighth Circuit Court of Appeals reversed Long's conviction, holding that a mistrial was not manifestly necessary because the district court failed to consider less drastic measures short of a mistrial. *Id.* at 761. The court determined that when "evaluated objectively and on the merits," the district court's decision "was an unreasonable application of clearly established Supreme Court precedent." *Id.*

If jeopardy has attached and the mistrial is declared without defendant's consent, the test is "whether in the context of the trial the declaration was dictated by manifest necessity or the ends of public justice." *State v. Gwara*, 311 Minn. 106, 108–09, 247 N.W.2d 417, 419 (Minn.1976) (citations omitted).

 The state argues that by failing to object to the state's motion, Olson impliedly consented to the mistrial. While we agree that a defendant need not expressly consent to a mistrial, and consent may be implied from the totality of the circumstances, the failure to object to a mistrial may not, standing alone, constitute consent. *State v. White*, 369 N.W.2d 301, 304 (Minn.App.1985), *review denied* (Minn. Aug. 20, 1985). It is simply a factor to be considered. *Id.* Contrary to the state's implication, Olson was not given the opportunity to object to the mistrial or to confer with his standby counsel on this issue. Immediately after the prosecutor's request for a mistrial, the district court stated, "Well, I agree that I should declare a mistrial, and will do so. * * * So a mistrial is declared and it's at the instance of the Defendant and his conduct." Olson, at this point appearing pro se, was not even given the opportunity to object. He was not given the opportunity to confer with standby counsel. The record shows no attempt by the district court or the prosecutor to insure that appellant had the time or the opportunity to confer with standby counsel Fritz, and the record is devoid of any inference that Fritz, as appellant's standby counsel, even impliedly consented to the mistrial. The record shows only that public defender Fritz straightforwardly, and with professional decorum, stood his ground and pointed out the alleged impropriety of his initial appointment and the failure to ever formally certify appellant as indigent and entitled to a public defender at the taxpayers' expense. Fritz consistently pointed out that he had not had the time to prepare for the case, was not in a position to represent appellant, and could not in good conscience start a serious criminal trial on the spur of the moment.

As a layman, Olson could not possibly have understood the import of failing to object to the prosecutor's request for a mistrial. He likely assumed that he was better off with a mistrial so he could get time to talk to an attorney because the record shows that the district court and the prosecutor implied to Olson that this mistrial was in the form of a continuance to help Olson with trial preparation. Olson had absolutely no idea that a district court judge might not be able to declare a mistrial after the jury had been sworn and guarantee the state the right to a second prosecution without his consent.

As noted, Olson did not have the chance to confer with standby counsel, who, at least, would have informed him of the consequences of consenting to a mistrial. Olson was never given the opportunity to make an informed decision whether to object to the prosecutor's mistrial request. Under the circumstances, Olson was effectively denied the chance to meaningfully challenge the prosecutor's request for a mistrial.

 The district court may have acted precipitously in declaring a mistrial. Having said that, there is no question, and the record reflects, that the district court, thoughtfully, and in appellant's best interests, reconsidered his previous decision to deny appellant time to hire private counsel. The court understood that the consequences of denying another continuance had the effect of ordering appellant to represent himself pro se on a serious charge. Upon further reflection, the district court understood that this trial was likely "hatched" from the beginning and there was probably a record full of error. For instance, the record shows that Olson was assisted with voir dire by the prosecutor. It is fundamental that a prosecutor cannot fulfill a defendant's right, pursuant to the U.S. Constitution's Sixth Amendment, to have "effective assistance of

counsel."[2] The prosecutor, by definition, cannot be a defendant's attorney. It is difficult to say which is worse, the perception or the reality. For instance, how possibly could a prosecutor effectively assist a defendant in exercising his peremptory challenges, the most important part of voir dire, at times an essential factor in the verdict of guilty or not guilty? If the prosecutor, through his own pretrial background check of the prospective panel, and through his observations of the jurors' demeanors when answering questions, and the answers themselves, is decidedly satisfied with six or seven members of the jury, could the prosecutor (would he? should he?) tell the defendant that he had better use his five peremptory challenges on some of those jurors because, as a prosecutor, he sure wants them!

The district court cannot be criticized, can be praised, for rethinking an earlier decision to require a defendant to proceed pro se. The problem is that the change of mind, likely a good change of mind, and one in accord with the administration of justice, came after the jury was impaneled, after the trial was started, and after jeopardy had attached.

This is the seminal issue before us. To give Olson a continuance/mistrial to obtain substitute counsel and prepare for a second trial could only come with a *carefully* laid record showing that Olson fully understood the implications of a mistrial/continuance and fully understood that by agreeing to one, he was waiving the possible defense of double jeopardy at the next trial. We do not have that record.

The record shows that the consequences of agreeing to a mistrial were not laid out in detail to Olson. The record does not show that Olson, with or without standby counsel, made an affirmative, fully informed, intelligent decision to consent to the mistrial with the explicit understanding that he could now be tried again.

At oral argument, the state argued that somehow Olson must have affirmatively consented to the mistrial because, "Well, Olson certainly knew there was going to be another trial." Our only response can be, "So what." The fact that Olson was told there was going to be another trial only means that a pro se defendant was told by a sitting judge that there was going to be another trial. All Olson could do at that point was assume that there would be one because the judge said so. That is far, far less than being told the serious implication of a mid-trial mistrial and being told exactly what his consent would mean, and being told he could make up his mind to consent, or not, after a reasonable time to confer with an attorney. None of that was done. Thus, Olson's "knowing" that there was going to be a second trial is nowhere near the equivalent of "assuming" that he waived his constitutional right not to be tried twice for the same offense.

In *Arizona v. Washington,* 434 U.S. 497, 515 at 515–16, 98 S.Ct. 824, 835, 54 L.Ed.2d 717 (1978), the United States Supreme Court held that the district court judge did not act precipitously in declaring mistrial where

> evincing a concern for the possible double jeopardy consequences of an erroneous ruling, *he gave both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial.*

(Emphasis added.)

In this sensitive framework, where the district court was trying to do the right thing for a pro se defendant, Olson had to have been given a full opportunity to address the propriety of a mistrial, especially in light of the fact that Olson's consent would likely be a waiver of the defense of double jeopardy. It would have been better for the court to have granted a short recess and have ordered Olson and his

**2.** *See* U.S. Const. amend. VI (entitling criminal defendant to "assistance of counsel for his

defense").

standby counsel to confer in private so at least Olson would fully understand the implications of agreeing to a mistrial. Also, in that private conference, standby counsel would have informed Olson that even though the court had the power to grant a mistrial over his objection, he had the right to object.

We conclude that, under these circumstances, Olson did not impliedly consent to the mistrial by failing to object to the prosecutor's request for a mistrial.

■■■■ Because Olson did not consent to the mistrial, the state must prove that a "manifest necessity" justified the mistrial. *See Long*, 562 N.W.2d at 296 (holding manifest necessity standard controls where mistrial declared without defendant's consent). The state argues that a mistrial was manifestly necessary because it allowed Olson to obtain the representation he desired and the time needed for counsel to prepare a defense.

■■■■ A high degree of necessity, not absolute necessity, must exist before a mistrial is appropriate. *Id.* In reviewing the district court's exercise of discretion and whether the mistrial was manifestly necessary, a reviewing court considers whether the district court adequately examined less drastic measures. *Id.* Where the district court, who is best situated to make such a decision intelligently, determines that "the ends of substantial justice cannot be attained without discontinuing the trial, it may declare a mistrial 'without defendant's consent, and even over his objection,'" and the defendant "may be retried consistently with the Fifth Amendment." *Gori*, 367 U.S. at 368, 81 S.Ct. at 1526 (citations omitted).

As Olson contends, the mistrial declared by the district court was caused, in large part, by the court's refusal to grant him a continuance so he could secure new counsel. The court refused to do so because it believed Olson was engaging in a delaying tactic to avoid trial. The court was also concerned about trial calendar manage-

ment and the delay a continuance would cause.

■■■■ The district court may deny a continuance if a defendant discharges his counsel for the purpose of delay or by arbitrarily choosing to substitute counsel at the beginning of trial. *State v. Fagerstrom*, 286 Minn. 295, 299, 176 N.W.2d 261, 264 (1970). This rule recognizes the need for sound judicial administration and a speedy trial. *Id.* One factor to be considered is whether the district court's denial of a continuance will prejudice the defendant's preparation and presentation of his defense. *Id.* The inconvenience of rearranging the court calendar "cannot outweigh [a defendant's] right to counsel." *In re T.D.F.* 258 N.W.2d 774, 775 (Minn. 1977) (citing *City of Minneapolis v. Price*, 280 Minn. 429, 435, 159 N.W.2d 776, 780 (1968) (holding inconvenience caused to court calendar is minor and "hardly justifies deprivation of a right as basic as the right to counsel")).

Here, the record does not support the district court's belief that Olson was engaged in delaying tactics. When the trial was called on January 5, 1998, the case was already nearly one year old. During this time, the matter had been continued three times. The first trial date was rescheduled at the request of the state. The matter was continued a second time presumably because Olson removed the first judge. It is unclear from the record why the trial was continued a third time. The record contains only a notice from the court administrator's office, notifying the parties that the trial had been continued from November 3, 1998, to January 5, 1999. Aside from the three continuances, the record is devoid of any evidence that in the one-year period before trial Olson engaged in or employed delaying tactics designed to avoid trial.

We also note that the day after the district court granted Olson a one-day continuance so he could obtain his file from Paulson, Olson retained the services of

attorney Strauss. This demonstrates Olson's willingness to cooperate with his defense and is not consistent with a finding that he was seeking to prolong the case unnecessarily. Strauss agreed to represent Olson if permitted a short time to prepare and familiarize himself with the case. This, coupled with the fact that there is no evidence that Olson had previously engaged in delaying tactics, does not support the district court's belief that Olson was interested in "avoiding trial." *Cf. State v. Miller*, 488 N.W.2d 235, 239–40 (Minn.1992) (holding defendant not entitled to continuance when he refused to cooperate and contributed to delay); *Fagerstrom*, 286 Minn. at 299–300, 176 N.W.2d at 264 (affirming denial of continuance where defendant, without explanation, sought new counsel on day of trial).

■■■■■ Further, under the unusual posture of this case, there is a serious issue of adequate time to prepare a defense. Whether Olson proceeded pro se, or by public defender Fritz, or by private counsel, at least a minimum reasonable time is essential and constitutionally protected. "In defining constitutionally infirm representation, * * * competent representation is premised on sufficient time to prepare a defense." *T.D.F.*, 258 N.W.2d at 775 (citation omitted). In light of the complexity of the case and the lack of time to do any preparation or investigation, Strauss stated that although he preferred a 90–day continuance, he could be ready for trial within 30 days. He was confident that at least with a 30–day continuance he could familiarize himself with the facts, conduct an investigation of the case, and prepare an adequate defense for Olson. Similarly, public defender Fritz stated candidly to the court that he was "strictly incompetent" to try the case because he was completely unfamiliar with the facts. He commented that Olson was probably better prepared to handle the case because, at the very least, Olson knew the facts. "When denial of a continuance deprives defendant's counsel of adequate tri-

al preparation, we must reverse the conviction." *T.D.F.* 258 N.W.2d at 775 (citation omitted).

Olson's request for a short continuance before trial was a far less drastic measure that would have obviated the need for a mistrial. The district court itself acknowledged that it did the equivalent of forcing Olson to appear pro se and to proceed with his own jury selection, which ended up with Olson being assisted by the prosecutor.

We can only conclude that when the district court properly reconsidered its prior decision to force Olson to trial without an attorney, it then had the obligation to lay a detailed and complete record showing that Olson intelligently consented to the mistrial (as a legal method of getting a continuance to hire counsel) with the unequivocal understanding that he was consenting to being tried a second time. A detailed and intelligent decision by Olson does not appear in the record.

It is regrettable that a charge that all consider serious ends on this abrupt note. However, the constitutional prohibition against trying a defendant twice for the same offense is fundamental, a sine qua non of American and Minnesota due process standards. On this record, the interests of justice require that Olson's conviction be reversed on the ground that his constitutional right against double jeopardy was violated.

### III. Ineffective Assistance of Counsel

Because we reverse Olson's convictions on double jeopardy grounds, we need not, in detail, address his claim that he received ineffective assistance of counsel. However, we note that his complaints against counsel are against an attorney whom he discharged long before both his mistrial, and even longer before the Lothenbach stipulation that he went through that gets us here today. There is no issue of ineffective assistance of counsel for us to decide. The last two attorneys of record for Olson, public defender Fritz and pri-

vate attorney Strauss, performed professionally and with competence.

## DECISION

■ Issues raised, but not reviewed, in a direct appeal that is dismissed may be considered in a subsequent petition for postconviction relief. A pro se defendant does not impliedly consent to the state's request for a mistrial where he is not given the opportunity to object or to consult with appointed standby counsel. A district court's concern over trial calendar management does not necessarily constitute manifest necessity allowing a defendant to be tried twice.

On this record, consistent with double jeopardy protections under the federal and state constitutions, it was impermissible to compel this defendant to go through a second trial.

**Reversed.**

DORIS OHLSEN HUSPENI, Judge (concurring in part, dissenting in part)

I agree that because the issues presented in Olson's petition for postconviction relief were never actually reviewed in his direct appeal, he is not precluded from raising them here.

I also agree that because the attorney against whom Olson raised the insufficiency of counsel claim was discharged prior to both the mistrial activity and the *Lothenbach* trial, there is no issue for this court to address, except to the extent, if any, that Olson's discharge of that attorney may be weighed in the analysis of the request for a continuance and, ultimately, in the consideration of the double jeopardy issue.

Further, I agree with the majority that on the record before us we cannot conclude that Olson impliedly consented to the mistrial by failing to object to the trial court's decision to grant it. I must, as did the majority, conclude that the mistrial was declared over the opposition of Olson.

There is actually very little in the majority's analysis in Section II with which I take issue. But, I must dissent from the majority's ultimate conclusion that Olson's constitutional right not to be placed twice in jeopardy was violated.

The majority discusses at some length the perils inherent in denying a request for a continuance when the seeker of the continuance is an accused without legal counsel. I agree with that discussion, and I suppose the trial court would, too. To the extent that the trial court acted in haste in denying the continuance, it repented fully during the "leisure" afforded after the jury was impaneled.

The trial court recognized the very substantial likelihood that it had erred seriously (and probably reversibly, too) in insisting that Olson go forth in circumstances providing fragile, if not non-existent, legal counsel. And the trial court concluded that a conviction obtained under such circumstances would very likely be reversed and remanded on appeal — a result that would involve court, prosecution, and defendant alike in a new trial. Steering between Scylla and Charybdis, the trial court declared a mistrial sua sponte.

I believe this case can be distinguished from *Long v. Humphrey,* 184 F.3d 758 (1999). In *Long,* the Eighth Circuit reversed the Minnesota Supreme Court and granted a writ of habeas corpus, determining that

> [g]iven the range of available and viable alternatives to mistrial, the trial court simply was not faced with the sort of urgent circumstances or the high degree of necessity contemplated by the manifest necessity standard.

*Id.* at 761.

A review of the trial court's discussion in this case (covering several pages of transcript) demonstrates its conclusion that the only alternative available was a mistrial.

That conclusion is a valid one. A review of the record also demonstrates the trial court's careful and deliberative consideration of the importance to Olson of having the charge against him decided in one trial and the importance of providing a fair trial to both the state and Olson.

I find no abuse of discretion in this case and would affirm the decision of the post-conviction court denying Olson's petition.