# Illinois Official Reports

## Appellate Court

---

### *People v. Kimble*, 2017 IL App (2d) 160087

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID D. KIMBLE, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-16-0087 |
| Filed | September 25, 2017 |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 13-CF-1123; the Hon. Sharon L. Prather, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, and Josette M. Skelnik, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Patrick D. Kenneally, State's Attorney, of Woodstock (Patrick Delfino, Lawrence M. Bauer, and Aline B. Dias, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Justices McLaren and Jorgensen concurred in the judgment and opinion. |

**OPINION**

¶ 1      On January 22, 2014, a McHenry County grand jury indicted defendant, David D. Kimble, on four counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1) (West 2012)) against nine-year-old S.M. The indictment charged that, on four separate occasions between August and November 2013, defendant touched S.M.'s vagina over her clothing. The jury trial consumed three days. After less than three hours' deliberation, the jury communicated to the court through the bailiff that it was at an "impasse." Without notifying the State and the defense, the judge directed the bailiff to instruct the jury to continue deliberating. After a total of five hours of deliberation, with significant interruptions, the jury foreman reported in open court that the jury was still at an impasse. The court denied the State's and defendant's request to give the *Prim* instruction for juries in disagreement,[1] remarking that it would be "futile" to do so, and *sua sponte* declared a mistrial. Defendant appeals the order denying his motion to dismiss the charges on the ground that reprosecution would be barred by double jeopardy pursuant to section 3-4(a)(3) of the Criminal Code of 2012 (720 ILCS 5/3-4(a)(3) (West 2014)). We reverse.

¶ 2                      I. BACKGROUND

¶ 3      Trial commenced on November 2, 2015. The evidence showed the following. S.M. lived in Wonder Lake, Illinois, with her father, Jeff, her three siblings, Jeff's girlfriend, Jen, and Jen's two children. For a time, they lived next door to defendant. Defendant and Jeff worked and socialized together. All of the children frequented defendant's home, and defendant babysat them. Even after Jeff and his family moved some distance away, the children continued to visit defendant. Defendant gave S.M. presents, including clothing, money, and a bicycle.

¶ 4      On December 5, 2013, Jen asked S.M. whether defendant had ever touched her inappropriately. S.M. at first was silent but then said yes. On December 10, 2013, Detective Misty Marinier interviewed S.M. at the Children's Advocacy Center (CAC) in Woodstock, Illinois. The interview was videotaped. During the interview, S.M. told Marinier that defendant touched her "privates" with his hand, and she pointed to the genital area on a chart depicting the female anatomy. S.M. told Marinier that her clothes were "usually" on when defendant touched her. Marinier testified that, according to S.M., the touching happened between two and five times, in defendant's bedroom. S.M. did not tell Marinier that defendant held her down or that he pulled down her pants. According to Marinier, children sometimes disclose more after they have been formally interviewed.

¶ 5      S.M., 11 years old at the time of trial, testified that defendant pushed her onto his bed, removed her clothes, and rubbed her "bad spot" approximately 10 times. She did not remember

---

[1]See *People v. Prim*, 53 Ill. 2d 62, 75-76 (1972) (approving the language of a draft instruction to be used by trial courts faced with juries in disagreement); Illinois Pattern Jury Instructions, Criminal, No. 26.07 (4th ed. 2000) (taken verbatim from the language approved in *Prim*). The *Prim* instruction informs the jury that the verdict must be unanimous, the jury has a duty to deliberate, the jurors must impartially consider the evidence, and the jurors should not hesitate to reexamine their views and change their opinions if they believe them to be erroneous, provided that the change is not due solely to the other jurors' opinions or the mere desire to reach a verdict. *People v. Chapman*, 194 Ill. 2d 186, 222 (2000).

when it happened, but she recalled that it was still daylight, and it always occurred in defendant's bedroom. S.M. testified that she did not tell Marinier that defendant removed her clothes. She testified that she was not comfortable talking to Marinier.

¶ 6    Anne Huff, the principal at S.M.'s school, testified that she interviewed Jen's daughter, Brooklyn, and then spoke to S.M. because Brooklyn told Huff that defendant had "snuggled" with her.

¶ 7    The parties stipulated that S.M. was interviewed by the State's Attorney's victim witness coordinator, Kelly Gallagher, on October 30, 2015. Assistant State's Attorneys Sharyl Eisenstein and John Gibbons were also present. S.M. told them that defendant had touched her over her clothes approximately 10 times. S.M. denied that defendant ever touched her under her clothes. S.M. stated that she was confused when she told the prosecutors the previous week that defendant touched her under her clothes. S.M. also stated on October 30, 2015, that defendant held her down and that her clothes were both "on" and "off." S.M. then said in that interview that, because she was embarrassed to talk about it, she told them that her clothes were on.

¶ 8    Brooklyn, age nine at the time of trial, testified that she knew "Dave," but she did not see him in the courtroom. Brooklyn testified that "Dave" knelt beside her and rubbed his hand over her upper thigh when she was on his bed.

¶ 9    Detective Michelle Asplund testified that she interviewed defendant on December 11, 2013. During the three-hour interview, defendant repeatedly denied any wrongdoing. The State rested. The court denied defendant's motion for a directed verdict, and defendant rested without presenting evidence.

¶ 10    On November 5, 2015, the jury began deliberating at 10:50 a.m. The jurors asked to watch the tape of Marinier's CAC interview with S.M. again. The time of that request is not noted in the record. The video of the interview was replayed for the jury in the courtroom at 1:40 p.m. The jurors returned to the jury room at 2:15 p.m.

¶ 11    At 4:25 p.m., the foreman sent a note to the judge: "Dear Judge Prather, after deliberating for 5 hours and despite our best efforts, we are at an empasse [*sic*]." After receiving this communication, the judge convened defense counsel and the State. The record does not show whether defendant was present. The judge disclosed the note, and she also disclosed that the jury had earlier indicated to her, through her bailiff, that it was at an "impasse." She divulged that she had instructed the bailiff to tell the jury to continue deliberating. According to the judge, that *ex parte* communication occurred "shortly after" the jury rewatched Marinier's CAC interview with S.M. Now, the judge suggested that she inquire whether further deliberation would help. She noted that she was willing to ask if the jurors would like to go home, sleep on it, and return the next morning. When the State wondered whether the judge's questions would elicit multiple responses, the judge stated: "I'll inquire of the foreperson." Defense counsel agreed to that procedure. The judge then acquiesced to the State's request to follow up on the foreman's answers with arguments outside the jury's presence on how next to proceed.

¶ 12    The jurors returned to the courtroom, and the judge asked the foreman how long the jury had been at an impasse. He replied, "[p]retty much a good part of the day. Four and a half hours or five hours." He indicated that "some numbers changed here and there, but we were stuck at a certain proportion" for the last three hours. The judge asked if it would do any good to go home and "sleep on it" and continue deliberations the next day. The foreman stated: "I asked

that question, and it was indicated that it would not [do any good]." The judge asked: "It would not?" The foreman replied: "No, ma'am." The jury then returned to the jury room.

¶ 13    The State and defense counsel both asked the judge to give the *Prim* instruction and to bring the jury back for further deliberations the following morning. The judge responded: "I am fearful, folks, if I do that, you're going to have some extremely angry jurors. *** There has been [*sic*] some very loud voices back there for a period of time. I think it would be futile to do that. Therefore, I would decline." The prosecutor said: "Understood, Judge." Defense counsel did not respond. The judge then excused the jurors and declared a mistrial. The State asked for another trial date. Defense counsel requested a status date.

¶ 14    On December 4, 2015, defendant filed a motion to dismiss the charges on the ground that reprosecution was barred by double-jeopardy principles. Defendant argued that, as he and the prosecution had both requested the court to give the *Prim* instruction and to order further deliberation, there was no "manifest necessity" to declare a mistrial. The court found that a manifest necessity existed and denied the motion. Defendant filed a timely appeal.

¶ 15                                    II. ANALYSIS

¶ 16    Defendant contends that the court abused its discretion in denying his motion to bar retrial where the trial judge's *ex parte* communication with the jury caused the conditions that led to the mistrial. The State argues that defendant consented or acquiesced to the mistrial or, alternatively, that there was a manifest necessity to declare the mistrial because the jury was hopelessly deadlocked. We review the denial of a motion to dismiss on double-jeopardy grounds for an abuse of discretion. *People v. Wilson*, 309 Ill. App. 3d 235, 242 (1999).

¶ 17                            A. Double-Jeopardy Principles

¶ 18    The fifth amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. The double-jeopardy clause applies to the states through the due process clause of the fourteenth amendment. *Benton v. Maryland*, 395 U.S. 784, 787 (1969). The Illinois Constitution also prohibits placing persons in double jeopardy. Ill. Const. 1970, art. I, § 10 ("[n]o person shall *** be twice put in jeopardy for the same offense"). The Illinois double-jeopardy clause is construed in the same manner as the double-jeopardy clause of the fifth amendment to the United States Constitution. *People v. Staple*, 2016 IL App (4th) 160061, ¶ 13. The deeply ingrained idea behind the prohibition against double jeopardy is that the State, with all its resources and power, should not be permitted to subject a defendant to the embarrassment, expense, and ordeal of multiple prosecutions. *People v. Cervantes*, 2013 IL App (2d) 110191, ¶ 24. Indeed, the prohibition against trying a defendant twice for the same crime is the *sine qua non* of American due process standards. *State v. Olson*, 609 N.W.2d 293, 303 (Minn. Ct. App. 2000). In a jury trial, jeopardy attaches when the jury is empaneled and sworn. *People v. Bellmyer*, 199 Ill. 2d 529, 538 (2002).

¶ 19    Because a second prosecution subjects a person to the ignominy alluded to above, the protection against double jeopardy embraces a defendant's "valued right" to have his trial completed by a particular tribunal. *Arizona v. Washington*, 434 U.S. 497, 503 (1978). For this reason, as a general rule, the prosecution is entitled to only one opportunity to try a defendant. *Washington*, 434 U.S. at 505. However, retrial is not automatically barred after a mistrial is declared. *Washington*, 434 U.S. at 505. A defendant's valued right to have his trial completed

by a particular tribunal sometimes must be subordinated to the public interest in affording the prosecution one "full and fair" opportunity to present its evidence to an impartial jury. *Washington*, 434 U.S. at 505. Reprosecution is also permissible where the mistrial is attributable to the defendant by virtue of his motion or consent. *People v. Dahlberg*, 355 Ill. App. 3d 308, 312 (2005). A defendant who requests or consents to a mistrial is presumed to have waived his or her valued right to have the trial completed by the jury that was originally seated. *People v. Bagley*, 338 Ill. App. 3d 978, 981 (2003).

¶ 20    When a mistrial is declared without a defendant's consent, retrial is permitted if there was a "manifest necessity" for declaring the mistrial. *Washington*, 434 U.S. at 505; *People v. Street*, 316 Ill. App. 3d 205, 211 (2000).[2] Discussing the phrase "manifest necessity," the Supreme Court held that it cannot be interpreted literally, but that a "manifest" necessity means a "high degree" of necessity. *Washington*, 434 U.S. at 505-06. The prosecution shoulders a heavy burden of justifying a mistrial to avoid the double-jeopardy bar. *Washington*, 434 U.S. at 505. That said, a trial judge may discharge a genuinely deadlocked jury and require a defendant to submit to a second trial. *Washington*, 434 U.S. at 509. The decision to declare a mistrial when the jury is deadlocked is accorded great deference by a reviewing court. *Washington*, 434 U.S. at 510. Whether a manifest necessity exists depends upon the particular facts, and a trial court's decision to declare a mistrial is reviewed for an abuse of discretion. *People v. Edwards*, 388 Ill. App. 3d 615, 625 (2009).

¶ 21                          B. Whether Defendant Consented to the Mistrial

¶ 22    Before the trial court, defendant joined the State in requesting the *Prim* instruction and in arguing that the jury should be brought back the next day to resume deliberations. Nevertheless, the State now maintains that defendant consented or acquiesced to the mistrial. Relying on *People v. Camden*, 115 Ill. 2d 369 (1987), the State contends that defendant had to specifically object to the mistrial, although at oral argument the State could not articulate when the objection should have been made.

¶ 23    In *Camden*, our supreme court held that defense counsel consented to a mistrial where he had two opportunities to object but stood mute and then later agreed to a date for retrial. *Camden*, 115 Ill. 2d at 377-78. *Camden* is readily distinguishable from our case. Here, defense counsel did not stand mute. Counsel joined in the State's request for the *Prim* instruction, and he also suggested that the court order the jury to keep deliberating. That conduct is inconsistent with a request for, or acquiescence to, a mistrial.

¶ 24    The State also relies on *People v. Escobar*, 168 Ill. App. 3d 30 (1988). In *Escobar*, the judge called the foreman of a deliberating jury into chambers when he discovered that the jurors had access to police street files. *Escobar*, 168 Ill. App. 3d at 35-36. When the judge suggested that he declare a mistrial, defense counsel stated: "We'll just have to proceed. We don't want to jeopardize our client's position." *Escobar*, 168 Ill. App. 3d at 36. The jury kept deliberating until it informed the court that it was unable to reach a verdict. *Escobar*, 168 Ill. App. 3d at 36. Then, the judge rejected defense counsel's request for the *Prim* instruction and *sua sponte* declared a mistrial. *Escobar*, 168 Ill. App. 3d at 36. Days later, the defendant objected to the mistrial and moved to dismiss the cause on double-jeopardy grounds. The judge

---

[2]The "manifest necessity" doctrine was first articulated in *United States v. Perez*, 22 U.S. (9 Wheat.) 579 (1824).

denied the motion, and the defendant appealed. *Escobar*, 168 Ill. App. 3d at 36. The First District Appellate Court affirmed, holding that the defendant was required to contemporaneously object to the mistrial, in words that specifically invoked the right against double jeopardy. *Escobar*, 168 Ill. App. 3d at 39. The court noted that the "suggestion of a *Prim* instruction, alone, is insufficient." *Escobar*, 168 Ill. App. 3d at 39.

¶ 25 Reviewing the *Escobar* decision in the context of a federal *habeas corpus* proceeding, the Seventh Circuit disagreed. In *Escobar v. O'Leary*, 943 F.2d 711 (7th Cir. 1991), the court noted that the United States Supreme Court has never required that an objection to a mistrial contain an explicit reference to double jeopardy to preserve a defendant's double-jeopardy rights. *O'Leary*, 943 F.2d at 715-16. "As long as the defendant's desire that the first jury continue deliberating is clear, there is no additional obligation to broach the topic of retrial." *O'Leary*, 943 F.2d at 716. This is so because judges are capable of recognizing that a mistrial has double-jeopardy implications. *O'Leary*, 943 F.2d at 716. The court concluded that Escobar's "unequivocal expression of his desire to proceed to verdict in the first trial was sufficient to dispel any implication that he consented to the mistrial or waived his double jeopardy objection." *O'Leary*, 943 F.2d at 717.

¶ 26 We agree with the reasoning in *O'Leary* and reject the *Escobar* decision. In *Bagley*, this court held that a defendant who "forcefully argued" his position that the trial should proceed was not obligated to specifically object when the court *sua sponte* declared a mistrial. *Bagley*, 338 Ill. App. 3d at 982. Other case law supports our conclusion.

¶ 27 In *State v. Kendrick*, 868 S.W.2d 134 (Mo. Ct. App. 1993), after a State's witness admitted committing perjury, the judge expressed his belief off the record that a directed verdict in the defendant's favor would be appropriate. *Kendrick*, 868 S.W.2d at 135. The judge indicated on the record that he wanted to end the case, but defense counsel suggested allowing the prosecution to proceed so that counsel could make a motion for a directed verdict at the end of the State's case. *Kendrick*, 868 S.W.2d at 135. Instead, the judge *sua sponte* declared a mistrial. *Kendrick*, 868 S.W.2d at 135. The defendant moved to dismiss the case on double-jeopardy grounds, but the motion was denied. *Kendrick*, 868 S.W.2d at 136. The Missouri Court of Appeals held that the defendant did not implicitly consent to the mistrial by failing to make a specific objection. *Kendrick*, 868 S.W.2d at 137. The court held that determining consent "does not turn on any mechanical formula." *Kendrick*, 868 S.W.2d at 136.

¶ 28 We agree. In our case, defense counsel's position that he wanted the trial to continue could not have been clearer. Defense counsel stated three times that he was requesting the *Prim* instruction. When the State suggested that the court give the *Prim* instruction before discharging the jury, defense counsel stated: "I would agree with the State, [Y]our Honor." The court responded: "Pardon?" Defense counsel repeated: "I would agree with the State." The court inquired: "You agree with the State?" Defense counsel replied: "I do." Defense counsel then suggested that the jury return the next day to deliberate. Surely, three requests for the *Prim* instruction as well as asking that the jury return the next day qualify as "forceful argument" under *Bagley*. In *Bagley*, in response to the State's eleventh-hour production of a videotape of the defendant's arrest that it had earlier represented was lost, defense counsel suggested that the court exclude the tape and proceed with the trial. *Bagley*, 338 Ill. App. 3d at 980. Here, defense counsel argued his position at least as forcefully as did counsel in *Bagley*. There was no need to make a *pro forma* objection when the court declared the mistrial. Accordingly, we

- 6 -

hold that defendant did not consent or acquiesce to the mistrial.

¶ 29                    C. Whether There Was a Manifest Necessity for the Mistrial
¶ 30                              1. Judicial Indiscretion
¶ 31        Much of the case law applying the manifest-necessity doctrine involves the proper evaluation of alternatives to a mistrial. 5 Wayne R. LaFave *et al.*, Criminal Procedure § 25.2(d) (3d ed. 2007); see *Street*, 316 Ill. App. 3d at 212 (one of the factors in determining whether there was a manifest necessity for a mistrial is whether the trial judge considered the alternatives). Here, defendant maintains that the judge's improper *ex parte* jury communication contributed to her subsequent decision to declare a mistrial rather than provide the available alternative of the *Prim* instruction. Defendant argues that this "judicial indiscretion" bars reprosecution.

¶ 32        Defendant relies on *People v. Wiley*, 71 Ill. App. 3d 641, 644-45 (1979), where the trial judge's *sua sponte* dismissal of the charges barred a retrial. In *Wiley*, after the arresting officer testified for the prosecution, the State requested an overnight continuance to bring in its two remaining witnesses. *Wiley*, 71 Ill. App. 3d at 642. The judge denied the request, and then, "on his own unprompted motion," dismissed the case. *Wiley*, 71 Ill. App. 3d at 642. The State appealed, arguing that the dismissal was not an acquittal that would trigger double-jeopardy concerns. *Wiley*, 71 Ill. App. 3d at 642-43. The appellate court held that, even if the dismissal was not an outright acquittal, retrial was prohibited because the decision to abort the trial was the result of what the court cryptically termed "judicial indiscretion." *Wiley*, 71 Ill. App. 3d at 644.

¶ 33        The court in *Wiley* relied on *United States v. Jorn*, 400 U.S. 470 (1971). In *Jorn*, the trial judge *sua sponte* declared a mistrial so that government witnesses, who assisted in preparing fraudulent tax returns, could consult with attorneys. *Jorn*, 400 U.S. at 473. Even though the government and the witnesses themselves assured the Court that federal agents had warned them of their constitutional rights, the Court refused to believe them. *Jorn*, 400 U.S. at 486-87. Then, the Court opined that, even if the witnesses had been warned of their rights, the warnings were insufficient. *Jorn*, 400 U.S. at 487. The Supreme Court held that reprosecution was barred because the trial judge considered nothing less drastic, such as a continuance, before declaring a mistrial. *Jorn*, 400 U.S. at 487.

¶ 34        A legal commentator has construed *Jorn* to mean that a trial judge abuses his or her discretion by ordering a mistrial without a "scrupulous" search for alternative means to deal with the difficulties. Stephen J. Schulhofer, *Jeopardy and Mistrials*, 125 U. Pa. L. Rev. 449, 465 (1977). Professor Schulhofer also observed that *Jorn* upheld the defendant's double-jeopardy claim "in the absence of actual or potential harassment and in the absence of identifiable prejudice to the defendant." Schulhofer, *supra*, at 466.[3]

¶ 35        When we read *Wiley* in light of *Jorn*, we interpret *Wiley* to mean that a mistrial is improper where the trial judge is responsible for the difficulty and alternatives are available. We agree with defendant that *Wiley* is apt.

_____

[3]According to Professor Schulhofer, the decision in *Illinois v. Somerville*, 410 U.S. 458 (1973), distinguished *Jorn* but can be reconciled with it. Schulhofer, *supra*, at 466-69.

- 7 -

¶ 36    In our case, the judge's *ex parte* jury communication led to the precipitous declaration of a mistrial without considering available alternatives. A criminal defendant has a constitutional right to a public trial, and to appear and participate in person and by counsel at all proceedings involving his or her substantial rights. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8; *People v. Childs*, 159 Ill. 2d 217, 227 (1994). Jury deliberations are a critical stage of trial, involving substantial rights that trigger a defendant's right to be present and participate in person and by counsel. *People v. Ross*, 303 Ill. App. 3d 966, 975 (1999). Communications between the judge and the jury after the jury has retired to deliberate, except when held in open court and in the defendant's presence, deprive the defendant of his or her fundamental rights. *People v. Cotton*, 393 Ill. App. 3d 237, 262 (2009). Thus, defendant suffered a deprivation of his fundamental rights when the judge engaged in the *ex parte* communication with the jury.

¶ 37    This tipped the scales in the judge's decision to *sua sponte* abort the trial rather than give the *Prim* instruction. The judge disclosed the *ex parte* communication to emphasize that the 4:25 p.m. note from the jury was "the second time" the court "received information from the jury that they [*sic*] are at an impasse." Hence, the judge concluded that it would be "futile" to give the *Prim* instruction and allow further deliberations. Without the earlier *ex parte* communication, the court could not reasonably have believed that giving the *Prim* instruction would be futile. The foreman's note said that the jury had been deliberating for five hours. However, we note that, in that time, it had also picked the foreman, eaten lunch, and rewatched the video of the CAC interview with S.M.

¶ 38    Furthermore, we determine that the judge's *ex parte* communication prejudiced defendant. We look at whether the content of the communication created prejudice. *Ross*, 303 Ill. App. 3d at 975. The judge told the bailiff to instruct the jury to "continue to deliberate." Presumably, that is what the bailiff conveyed to the jury, though the bailiff's precise words are not part of the record. That direction was given when the jury first indicated that it was at an impasse, "shortly after" it rewatched the video. The purpose of the *Prim* instruction is to guide a jury that is unable to reach a verdict. *People v. Chapman*, 194 Ill. 2d 186, 222 (2000). Having the bailiff tell the jury to "continue to deliberate" left the jury with no guidance. Indeed, jurors voting in the minority conceivably could feel coerced if, when seeking guidance from the court, "they are met with stony silence and sent back to the jury room for further deliberation." *Prim*, 53 Ill. 2d at 74.

¶ 39    As a result, our supreme court approved a jury instruction to avoid that state of affairs. *Prim*, 53 Ill. 2d at 76. In *Prim*, the instruction was given after approximately four hours of deliberation. *Prim*, 53 Ill. 2d at 71. In *People v. Andrews*, 364 Ill. App. 3d 253, 267 (2006), a mistrial was not declared until after the jury had been deliberating under the *Prim* instruction for 90 minutes. In *People v. Dungy*, 122 Ill. App. 3d 314, 324 (1984), the *Prim* instruction was given after 12 hours of deliberation. In *Dungy*, the appellate court noted that "[i]t is within the trial court's discretion to permit further deliberation and to monitor the length of such deliberation even after a jury has indicated that it is hopelessly deadlocked." (Internal quotation marks omitted.) *Dungy*, 122 Ill. App. 3d at 324.

¶ 40    The purpose of a defendant's right to be present with counsel at any jury communication is so that counsel can "aid and advise the defendant as to what course of action he should take, including whether to object, concur, or attempt to influence how the court addresses the jury." *Ross*, 303 Ill. App. 3d at 976. Here, the court's *ex parte* communication foreclosed defendant's option to request the *Prim* instruction earlier in the afternoon when the jury first considered

itself at an impasse. Then, because the jury declared itself still at an impasse approximately two hours later, the court declined to give the *Prim* instruction, which provides as follows:

> "The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.
>
> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.
>
> You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case." *Prim*, 53 Ill. 2d at 75-76.

Our supreme court explicitly directed that trial courts give this instruction when faced with juries in disagreement. *Prim*, 53 Ill. 2d at 76. In *People v. Cowan*, 105 Ill. 2d 324, 328 (1985), the court held that whether and when to give the instruction is discretionary, based upon such factors as the length of the deliberations and the complexity of the issues. It is proper to give the *Prim* instruction if the court perceives that the jury is having difficulty reaching a verdict. *People v. Preston*, 76 Ill. 2d 274, 284 (1979). The court is not required to delay giving the instruction until the foreman flatly states that the jury cannot reach a verdict. *Preston*, 76 Ill. 2d at 284. The court may have the jury continue to deliberate even though it has reported that it is deadlocked and will be unable to reach a verdict. *Cowan*, 105 Ill. 2d at 328. When faced with a deadlocked jury, a trial judge should not leave the jury "to grope in such circumstances without some guidance from the court." *Prim*, 53 Ill. 2d at 74.

¶ 41 The State argues that the court's *ex parte* admonition to "continue to deliberate" was the equivalent of the *Prim* instruction. We disagree. The purpose of the *Prim* instruction is to ensure that deadlocked jurors will closely examine their competing views and attempt to reach a unanimous verdict. *People v. Bibbs*, 101 Ill. App. 3d 892, 900 (1981). The instruction to "continue to deliberate" did not contain the five points inherent in the *Prim* instruction: (1) to return a verdict, each juror must agree thereto, (2) jurors have a duty to consult with one another and to deliberate with a view to reaching agreement, (3) each juror must decide the case for himself or herself but only after an impartial consideration of the evidence with fellow jurors, (4) jurors should not hesitate to reexamine their own views and change their opinions if convinced they are erroneous, and (5) no juror should surrender his or her honest conviction. *Prim*, 53 Ill. 2d at 74-75. Whereas the *Prim* instruction encourages jurors to reexamine their opinions and to abjure them if the evidence warrants it, the direction to "continue to deliberate" conveys a different message: "Keep doing the same thing you're already doing." The judge's *ex parte* communication thus might have contributed to the jury's lack of progress and later did unduly influence her denial of the joint request for the *Prim* instruction. Consequently, we hold that the court's judicial indiscretion, rather than a manifest necessity, prompted the mistrial. Under these circumstances, reprosecution is barred.

¶ 42                                2. Jury Deadlock

¶ 43     Even though we have determined that retrial is barred due to judicial indiscretion, we nevertheless will consider defendant's argument that there was no manifest necessity to declare the mistrial due to jury deadlock. In *Andrews*, this court identified six factors to consider where the issue presented is the manifest necessity for declaring a mistrial based on jury deadlock: (1) the jury's collective opinion that it cannot agree, (2) the length of the deliberations, (3) the length of the trial, (4) the complexity of the issues, (5) any proper communications that the judge has had with the jury, and (6) the effects of possible exhaustion and the impact that coercion of further deliberations might have on the verdict. *Andrews*, 364 Ill. App. 3d at 266-67. Reviewing courts must examine the facts of each case to determine the propriety of a double-jeopardy claim. *Street*, 316 Ill. App. 3d at 211.

¶ 44     Turning to the factors set forth in *Andrews*, we examine whether the mistrial in the present case was a manifest necessity.


¶ 45              a. The Jury's Collective Opinion That It Is Deadlocked

¶ 46     After receiving the jury's 4:25 p.m. note, the court brought the entire jury into the courtroom but spoke only to the foreman.[4] The foreman related that the jury had been at an impasse "pretty much a good part of the day. Four or five hours." He also indicated that "some numbers changed here and there, *but we were stuck at a certain proportion for the last three hours*." (Emphasis added.) The foreman opined that it would not do any good to continue deliberations the next day. The salient point is that the actual deadlock was only three hours old.

¶ 47     As the court explained in *Mills v. Tinsley*, 314 F.2d 311, 313 (10th Cir. 1963), "[t]he jury cannot determine the length of its deliberations." The court also noted that "[i]t is not unusual for a jury to advise the court that it is deadlocked and to thereafter agree and return a verdict." *Mills*, 314 F.2d at 313. In *Mills*, the jury reported that it was deadlocked, but it nevertheless returned a verdict after being given a deadlocked-jury instruction. *Mills*, 314 F.2d at 312-13. Thus, the jury's own view of whether it can reach a verdict is only one factor in the court's determination. *People v. Thompson*, 93 Ill. App. 3d 995, 1008 (1981). "There is no requirement that a mistrial be declared because of the jurors' inability to come to a unanimous verdict immediately." *People v. Logston*, 196 Ill. App. 3d 30, 33 (1990). Pertinently, a trial court is not required to accept a jury's assessment of its own inability to reach a verdict. *Logston*, 196 Ill. App. 3d at 33.

¶ 48     Here, the judge expressed her belief that "you're going to have some extremely angry jurors" if deliberations were allowed to continue. Experience shows that tempers flare in the emotional atmosphere of a criminal trial. In other words, angry voices do not necessarily signal a hopelessly deadlocked jury.

---

[4]In *Andrews*, this court held that a mistrial due to jury deadlock may be declared even where the trial judge relies on the foreperson's statement without polling the other jurors. *Andrews*, 364 Ill. App. 3d at 268. However, we expressed that polling each juror with respect to his or her opinion on the issue of deadlock is the preferred procedure. *Andrews*, 364 Ill. App. 3d at 268.

¶ 49                    b. The Length of Deliberations, Length of Trial,
                                    and Complexity of Issues

¶ 50        Generally, the longer the trial and the more complex the issues, the longer the jury should be given to deliberate. *Andrews*, 364 Ill. App. 3d at 269. Here, the trial involved four counts of aggravated criminal sexual abuse, and it lasted three days. The five hours that the jury deliberated included time-outs to pick the foreman and to eat lunch, as it retired to deliberate near the lunch hour. Then, the jury spent over a half hour rewatching the video of the CAC interview.

¶ 51        The issue that the jury had to resolve was S.M.'s credibility. That issue was anything but straightforward. Jen was the first person to ask S.M. if defendant had touched her inappropriately. S.M. at first did not answer, but then she indicated that defendant had touched her. The indictment charged that the touching occurred over S.M.'s clothing because that was what she told investigators. She also told investigators that it happened two to five times. Then, S.M. testified that it happened 10 times and that defendant removed her clothes. The parties stipulated that S.M. had variously told members of the State's Attorney's office that she was dressed or undressed. Consequently, we cannot agree with the State that determining S.M.'s credibility was a simple job.

¶ 52                    c. Communications Between the Judge and the Jury

¶ 53        The judge and the jury communicated three times. The first communication was on the jury's request to rewatch the video of the CAC interview. As discussed above, the second, *ex parte* communication caused the court to end the trial prematurely when it received the third communication (the note) because the court had foreclosed all other options. It is significant that neither side moved for a mistrial.

¶ 54                    d. Effect of Exhaustion on the Jury

¶ 55        Because the jury did not deliberate for even a full workday, this factor weighs against a manifest necessity to declare a mistrial.

¶ 56        We are mindful that, while trial judges have "considerable leeway" in determining whether the jury is hopelessly deadlocked, the reviewing court has an obligation to satisfy itself that the trial judge exercised sound discretion. *Renico v. Lett*, 559 U.S. 766, 785 (2010) (Stevens, J., dissenting, joined by Sotomayor and Breyer, JJ.). If the record establishes that the trial judge failed to exercise sound discretion, the reason for deference disappears. *Renico*, 559 U.S. at 785-86. Accordingly, we hold that there was no manifest necessity for the court's *sua sponte* declaration of the mistrial. It follows that the court abused its discretion in denying defendant's motion to bar reprosecution. Pursuant to this court's authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), we grant defendant's motion to bar reprosecution.

¶ 57                                III. CONCLUSION

¶ 58        For the foregoing reasons, the judgment of the circuit court of McHenry County is reversed and defendant's motion to bar reprosecution is hereby granted.

¶ 59        Reversed.